C. H. SPITZNER & SON, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 80744. Promulgated March 22, 1938.

*J. Marvin Haynes, Esq.*, for the petitioner.
*Chester A. Gwinn, Esq.*, for the respondent.

514

516

OPINION.

MURDOCK: Section 104 is entitled "Accumulation of Surplus to Evade Surtaxes." The provisions of the section impose a tax of 50 percent of the net income of the corporation. That tax is in addition to the tax imposed by section 13, and the net income includes divi-

dends and interest on certain obligations of the United States, which items are not normally taxed to corporations but are subject to tax in the hands of an individual owner. The following quotations are from paragraphs (a) and (b) of the section:

(a) If any corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its gains and profits to accumulate instead of being divided or distributed, * * *

(b) The fact that any corporation is a mere holding or investment company, or that the gains or profits are permitted to accumulate beyond the reasonable needs of the business, shall be prima facie evidence of a purpose to escape the surtax.

The Commissioner has held that the petitioner is liable under section 104. In such cases he sometimes makes a categorical determination under (b). Here he has not made a categorical determination that the petitioner is a mere holding or investment company, or that its gains or profits have been permitted to accumulate beyond the reasonable needs of the business. Nevertheless, we shall consider whether or not (b) applies. The facts show conclusively that the petitioner was not a mere holding or investment company. It regularly carried on a business. It did nothing else. The character of the business was quite different from that of a mere holding or investment company. Furthermore, the fact that the gains or profits were not permitted to accumulate beyond the reasonable needs of the business is clear from the record. The Commissioner has made his determination on the basis of conditions as they existed at the close of the taxable year. The books of the corporation at the close of 1932 showed a surplus of $318.12. The corporation, in computing that surplus, valued its securities and fixed assets at market. The Commissioner does not contend that the values used by the petitioner were other than the correct fair market values of the assets in question. It had followed the practice of inventorying those assets at market during its entire existence, and for all purposes other than the computation of its taxable net income. However, it was not allowed to use inventories of those assets in computing its taxable net income and it did not use the inventories for that purpose, but used cost. Sec. 22 (c); Regulation 77, art. 105. The Commissioner, by using the cost of the securities and the cost less depreciation of the fixed assets, has computed a surplus of somewhat more than $2,000,000 at the close of 1932. It is unnecessary, for the purpose of paragraph (b), to determine whether or not a surplus of that amount was "beyond the reasonable needs of the business", since no such surplus was available for the needs of the business. The paragraph sets up a practical test rather than a theoretical one. Was there an accumulation "beyond the reasonable needs of the business?" The assets would

be useful to the business only to the extent of their actual market values. The fact that they cost a greater amount would not benefit the business. Thus the surplus based upon cost, as computed by the Commissioner, was not available for the reasonable needs of the business. It did not actually exist and could not have been used in the business. Business men and bankers, worthy of those names, would not have regarded it as a surplus. The accumulation of surplus which the petitioner actually had for use in the business amounted to only $318.12. That small surplus did not represent an accumulation of gains or profits beyond the reasonable needs of the business within the meaning of paragraph (b).

Nevertheless the Commissioner has determined that section 104 applies. He has wiped out the net loss for the year by adding dividends and a relatively small amount of interest from Government obligations, which are only taxable to the petitioner in case section 104 applies. The Board must decide whether or not the petitioner was formed or availed of in 1932 for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its gains or profits to accumulate instead of being divided or distributed. The determination of the Commissioner is presumed to be correct, and the petitioner was required "to show its hand." *United Business Corporation of America* v. *Commissioner*, 62 Fed. (2d) 754; certiorari denied, 290 U. S. 635. It has made what appears to be a complete disclosure of the facts. The test is the state of mind of those persons responsible for the formation and operation of the petitioner. *United Business Corporation of America* v. *Commissioner*, *supra*. Even though the effect of the formation and operation of the corporation may have been to avoid surtaxes, still section 104 does not apply unless the purpose, the intention of the participants, was to prevent the imposition of surtaxes upon themselves by permitting the gains and profits of the corporation to accumulate instead of distributing them. *Cecil B. De Mille*, 31 B. T. A. 1161; affd., 90 Fed. (2d) 12; certiorari denied, 302 U. S. 713.

Counsel for the respondent argue in brief that this corporation was *formed* for the purpose mentioned in section 104 (a). In order to reach that conclusion they have to argue that the testimony of the principal witness should be disbelieved. They point to the fact that the two partners paid in dividend-bearing securities, and to certain other circumstances. Self-serving declarations of interested witnesses are not necessarily determinative. Yet such testimony can not be waved aside merely because of its character. If it comes from witnesses who are impressive, if it is reasonable, if it is not inconsistent with other evidence in the case, and if it is corroborated by other evidence, it is important evidence. The reasons for the incor-

poration of this petitioner at the close of 1920 are clear from the testimony of Kienbusch, and they were wholly unrelated to a purpose of preventing the imposition of a surtax upon shareholders.

Kienbusch had been active in the business for a number of years. He had become an equal partner with Spitzner. A large part of the responsibility for the successful conduct of the business rested upon him. His entire fortune of about $1,000,000 was risked in the business as long as the partnership continued. He wanted to limit his liability from the business. He was apprehensive about the health of his partner. That partner had contributed about two-thirds of the capital of the partnership. Kienbusch realized that in case of Spitzner's death his personal representatives, in a proper administration of his estate, would probably withdraw his property from the hazardous business of the partnership. Kienbusch, having all of these things in mind, sought to organize the corporation. Spitzner opposed the change, largely for sentimental reasons, but finally succumbed to his partner's persistent urging. The petitioner was formed and thus the purposes which Kienbusch had in mind were accomplished, i. e., to limit his liability and to remove the danger of liquidation which might result from the death of Spitzner. Kienbusch testified that tax benefits were not considered or discussed and the evidence corroborates his statement. Therefore, we have no hesitation in concluding that section 104 may not be invoked by reason of the purpose leading to the formation of the petitioner.

A somewhat more difficult question is whether the petitioner was *availed of* during the year 1932 for the purpose described in section 104. Although the petitioner sustained a loss from the operation of its business in that year, it had gains and profits in the form of dividends and interest from its securities, and it permitted those to accumulate, instead of dividing or distributing them. Had the individual stockholders owned those securities during 1932, those gains would have been subject to surtaxes in their hands and, obviously, the intervention of the corporation prevented the imposition of surtaxes upon the shareholders. But the same would be true of any corporation which received any dividends. Yet Congress did not intend to impose the severe penalty of section 104 upon all such corporations. For example, the provisions of that section were never intended to apply to a corporation which limited its activities to some branch of agriculture, manufacture, or merchandising and made normal distributions. *United Business Corporation of America*, 19 B. T. A. 809; affd., 62 Fed. (2d) 754. However, the stockholders of that kind of a corporation might bring their corporation under the lash of section 104 by diverting it from its normal business activities and intentionally using it during any taxable year for the purpose of

preventing the imposition of surtax upon themselves through the medium of permitting its gains and profits to accumulate instead of being divided. The question here narrows to this, Does the fact that the petitioner accumulated its tax exempt gains from dividends and interest, instead of distributing them, show a purpose on the part of its shareholders to prevent the imposition of the surtax upon themselves?

The incorporators of the petitioner believed, when they organized it, that it would need capital of at least $4,000,000 to successfully conduct its tobacco business. Kienbusch contributed as much as he could. Although their interests in the partnership had been equal, and although Kienbusch wanted his interest in the corporation to be as near a 50 percent interest as he could make it, nevertheless Spitzner also contributed over $100,000 to the business just before the formation of the corporation. The property contributed by Kienbusch had previously been held as collateral for a loan used in the business. Earnings of the first year were capitalized in order to give the corporation $4,000,000 capital. These and other circumstances indicate that the stockholders believed that $4,000,000 was needed in the business. That amount was used during 1922. The actual capital available for use in the business in 1932 was still approximately $4,000,000.

The business of the corporation in 1932 was not what it had been in 1922. It had fallen off very badly. But the petitioner never slackened its efforts to make a success of the tobacco business. Kienbusch, in his testimony, gave what he regarded as the principal reasons for the decline in sales and profits. The factors upon which he blamed the slump were of a temporary character, and he expressed confidence that the business would recover, would again have gross sales of $3,000,000, and would again need all of its available funds. The opinions which he expressed as to the future possibilities and needs of the business were honestly held by him and were not unreasonable. The respondent says he was an "incorrigible optimist." He may have been, but, if so, his optimism rather negatives the purpose described in section 104. All of the assets, including all gains and profits accumulated up to the end of 1932, would be necessary and desirable for the successful conduct of the business in case it should again expand to a volume equivalent to that of 1922.

Certainly there was good reason for the failure of the corporation to declare any dividend in 1932. Operations were conducted at a loss in that year and in prior years. The value of the assets had materially declined. The officers hoped and expected to continue in business. Capital available for business purposes would have been impaired by any distribution at that time. The financial standing

of the petitioner during the trying times through which it was passing was precarious. The addition of any avoidable strain would have been unwise. The failure to declare dividends in 1932 may not fairly be taken as an indication of a purpose on the part of the shareholders to avoid surtaxes.

The amount of the investment of this corporation in securities had grown tremendously from its early days up to the period here involved. But the reason for that change is also satisfactorily explained in this record. As the business of the corporation declined, a smaller and smaller portion of its capital was used for operating purposes. Common sense required that the inactive funds be employed as profitably as they might be. So it is not surprising that they were invested in income producing securities. The corporation had to be ready at all times to take full advantage of a good crop and of any increased demand for its products due to a return of better times. The investments were generally in high grade, listed securities. The assets were thus retained in as liquid form as could be, ready for prompt use in the business either as collateral or by conversion into cash when, as, and if the part of that business which had been lost was recovered.

The books of the corporation at the close of 1931 showed a surplus of $179,868.92, and at the close of prior years showed surpluses in much larger amounts. The question of whether or not the corporation was availed of in those years to avoid surtaxes on the shareholders is not the question for decision here. Nevertheless, the situation in those years may be scrutinized in an effort to determine whether or not a purpose of the kind described in section 104 existed in the year 1932. A large part of the book surplus shown in prior years represented the write-up resulting from the annual inventory of securities at market. The surplus in some of those years may have been beyond the reasonable needs of the business. However, the Commissioner never attempted to apply section 104, or its counterpart in earlier acts, to the income of this petitioner for any of those years. Dividends in substantial amounts were paid in most of those years. The large book surplus of these years had disappeared prior to 1932. Although the facts relating to those prior years do not show that the corporation was never availed of for the purpose of preventing the imposition of the surtax, that circumstance is not important, since the conclusion can not be drawn from those facts that the shareholders in 1932 had a purpose to avail of the petitioner to avoid surtaxes.

The two principal stockholders of the petitioner had been indebted to it at times for small amounts of money. When so indebted, they were charged with and they paid interest on the indebtednesses. But for the most part and in much larger amounts the corporation was

indebted to those stockholders for advances made by them to meet the needs of the business. Interest was paid on those advances. Thus, this is not a case where the principal stockholders have withdrawn funds of the corporation through loans so that they might have the use of the accumulations and, at the same time, save surtaxes by not receiving the dividends and interest directly.

Kienbusch, the treasurer, was indebted to the corporation in the amount of $18,000 at the close of 1932. This loan to him was necessitated by conditions in his own finances brought on by the depression. He did not like to be indebted to the corporation and sought legal advice to learn whether or not the corporation might declare a dividend sufficient to enable him to discharge this indebtedness. He was advised that, inasmuch as the books of the corporation showed insufficient surplus, a dividend could not be paid and any distribution would impair capital, rendering the officers and directors liable civilly and criminally for their action. These circumstances have some tendency to negative a purpose to avoid surtaxes.

The explanation of the investments of this petitioner in the stock and securities of other tobacco companies and of its loans to those companies leads inescapably to the conclusion that those investments and loans were incidental to and reasonably necessary in the successful conduct of the tobacco business of the petitioner. Most of the purchases were made by the partnership before the organization of the petitioner. They not only led to sales of tobacco to those particular companies, but they led indirectly to sales to other companies. Some of them were made in the hope of sales and profits which never materialized. But it may not be inferred from that unfortunate circumstance that the investments were unrelated to the business of the petitioner or that they indicate a purpose to evade surtaxes. The loans and the purchases were made to assist customers financially, to promote sales, or for both purposes.

The parties have filed rather lengthy briefs which indicate that they have carefully considered the mass of detailed facts and figures in this record. This discussion would be unduly prolonged were it to include comments on every point made by the parties. But our failure to mention any particular point in this opinion may not be taken as an indication that some point or argument made has not been carefully considered. It does seem proper, however, to make special mention of three of the cases cited by the respondent. The Board held in *Rands, Inc.*, 34 B. T. A. 1094, and in *Nipoch Corporation*, 36 B. T. A. 662, that the corporation there was availed of within the year for the purpose described in the statute, despite the fact that in each case the corporation would not have had any surplus had its securities been valued at market. The differences between those cases and the present case are marked. Each of those corporations was a mere holding or

investment company. Neither had any business like that of the petitioner in this case. The activities of those corporations up to and including the taxable year involved were indicative of purposes on the part of the shareholders to avail of the corporations to prevent the imposition of the surtax upon the shareholders. Here the activities of the petitioner for a similar period indicate an absence of such a purpose. Purpose is the test, and those cases are not authority one way or the other for decision of the present proceeding. The facts in the case of *National Grocery Co.*, 35 B. T. A. 163, in some respects parallel the facts in the present case. However, the decision of the Board in that case was reversed, 92 Fed. (2d) 931, and, to the extent that the facts are parallel, that case now supports the contention of the petitioner in this case.

Reviewed by the Board.

*Decision will be entered for the petitioner.*

----

HARRON, dissenting: I respectfully dissent from the majority opinion. Certain agreed facts, together with detailed schedules of the financial history of the petitioner corporation from 1922 to 1932, inclusive, have been filed in this proceeding and provide the ground for the dissenting opinion.

The petitioner reported, for the year 1932, no income tax liability. It had realized a net loss from its tobacco business in 1932 in the amount of $56,089.29. It had received net income from investments in the amount of $255,043.43, but it appears that, dividends being deductible under section 23 (p) of the Revenue Act of 1932 and interest on obligations of the United States being not taxable, these were not includable in taxable net income under ordinary circumstances. The Commissioner, pursuant to the provisions of section 104 (c), has determined that the petitioner had a net income for the year 1932 since, under subsection (c), dividends and interest would be includable in the net income of a corporation which came within the other provisions of section 104. In his notice of deficiency the Commissioner states:

After careful consideration of your Federal income tax return and all other available information, the Bureau holds that your corporation is subject to taxation under the provisions of section 104 of the Revenue Act of 1932.

From the notice of deficiency it is evident that the Commissioner based his determination upon the conclusion that the petitioner had run afoul of the provisions of section 104 generally, although the determination was not based upon section 104 (b) specifically. After the hearing in this proceeding the respondent asked that this Board find as a fact that the petitioner had violated section 104 (b); namely, that its gains and profits were permitted to accumulate beyond the

524

reasonable needs of the business in the taxable year. The respondent contends that petitioner was formed for the purpose of escaping surtax on its shareholders; that the petitioner was availed of to escape surtax of its shareholders; and that gains and profits of petitioner were permitted to accumulate beyond the reasonable needs of its business. There is, therefore, the question in this proceeding whether the facts show that in the taxable year 1932 the petitioner permitted its gains or profits to accumulate beyond the reasonable needs of the business. This question is a fact question. If the facts show such circumstance as is covered by subsection (b), the statute regards this as prima facie evidence of a purpose to escape surtax and the burden is upon the petitioner to introduce evidence to overcome such prima facie evidence. The majority view concludes that the evidence does not show a state of mind in the two chief stockholders of petitioner to operate their corporation so as to prevent the imposition of surtaxes upon themselves. It is always difficult to obtain the admission of the interdicted purpose, but the facts relating to the financial history of the corporation in question, the fair needs of the business, and the conduct of its officers may disclose the interdicted purpose.

There are several questions, one of which is, Were the gains and profits of petitioner permitted to accumulate beyond the reasonable needs of the business in 1932 and does the evidence show that petitioner has overcome the prima facie evidence of a purpose to escape surtax? It is the view of this dissenting opinion that the evidence shows that the gains and profits of petitioner were permitted to accumulate beyond the reasonable needs of its *tobacco* business and that there is not sufficient evidence to overcome the prima facie evidence of a purpose to escape surtax. The following discussion of the evidence is believed to support this conclusion.

At the close of 1932 the petitioner had the following assets, excluding investments in securities: Cash, $434,102.75; notes and loans receivable, $186,481.11; accounts receivable, $206,826.40; inventories, $258,994.82; advances to agents and farmers, $29,061.70; investments in stock of tobacco companies, $676,803. Its only current liability was accounts payable in the amount of $219,952.16. Petitioner had followed a practice of "writing down" the asset values of investments to the current market prices at the end of the fiscal year, so that at the end of 1932 securities and mortgages which had a cost value of $4,936,586.26, had a book value of $2,237,068. On the basis of the book value of the petitioner's investments, petitioner showed a surplus of only $318.12. There is no evidence, other than the book value adopted by petitioner, of the value of securities in the taxable year. It has not been found as a fact that the value of the securities in 1932 was the book value. It is petitioner's contention that no divi-

dend could have been declared in 1932 because there was no substantial surplus upon its books, so that to have paid a dividend would have impaired capital. It is a question of fact whether payment of a dividend in the taxable year would have impaired capital. In effect petitioner argues that its earnings were "impounded" on account of the shrinkage of its security values at the end of the taxable year. This argument of petitioner must be weighed against the financial record of the company, which shows that in over 10 years the petitioner accumulated $2,577,759.63 from dividends, net income from operations of the tobacco business, and net profit from the sales of securities. This amount is a net amount excluding a total of $660,000 dividends declared and paid by petitioner over the 10-year period. It appears that these accumulated earnings were invested from year to year in the purchase of more dividend-producing securities, for the cost value of petitioner's investments increased over the 10 years in the amount of $3,663,483.15. The following schedule shows this.

*1922–1932, inclusive.*

| | |
|---|---:|
| Dividends from investments | $2,389,116.93 |
| Net income from operations, less losses | 671,419.61 |
| Net profit from the sales of securities, less losses | 177,223.09 |
| Total | 3,237,759.63 |
| Less: Dividends paid by petitioner | 660,000.00 |
| Net earnings and gains | 2,577,759.63 |
| Cost of investments, end of 1932 | 4,936,586.26 |
| Cost of investments, end of 1922 | 1,273,103.11 |
| Increase in investments, 10 years | 3,663,483.15 |

The following schedule from comparative balance sheets of petitioner, excluding a stock dividend paid in 1922 in the amount of $290,000, shows that the petitioner had an earned surplus at the end of 1932 in the amount of $2,107,845.88.

| Period | Assets | Net earnings | Earned surplus | Dividends paid and declared |
|---|---:|---:|---:|---:|
| 1-3-22 | $4,481,773.97 | | | |
| 12-31-22 | 4,903,402.08 | $405,209.99 | $55,209.99 | $60,000 |
| 12-31-23 | 4,961,018.09 | 314,499.72 | 289,709.71 | 80,000 |
| 12-31-24 | 5,061,406.95 | 107,192.42 | 353,623.17 | 40,000 |
| 12-31-25 | 5,321,733.34 | 120,580.67 | 434,792.14 | 40,000 |
| 12-31-26 | 5,668,409.64 | 315,995.40 | 670,787.54 | 80,000 |
| 12-31-27 | 6,705,878.52 | 314,784.54 | 865,572.08 | 120,000 |
| 12-31-28 | 8,165,271.79 | 468,277.10 | 1,213,849.18 | 120,000 |
| 12-31-29 | 8,059,423.02 | 395,286.87 | 1,529,136.05 | 80,000 |
| 12-31-30 | 6,184,241.72 | 216,485.56 | 1,705,621.61 | 40,000 |
| 12-31-31 | 4,545,523.17 | 203,270.13 | 1,098,891.74 | |
| 12-31-32 | 4,220,270.28 | 198,954.14 | 2,107,845.88 | |
| Total | | 3,060,536.54 | | 660,000 |

From this we believe that the amount of $318.12 which petitioner contends was its true surplus, was not the true surplus available for dividends, but that the actual earned surplus available for dividends was $2,107,845.88. The securities and fixed assets which petitioner "wrote-down" were owned by petitioner at the end of the taxable year and no actual reduction in earned surplus was effected during the taxable year, for the assets were not disposed of. Cf. *R. & L., Inc.*, 33 B. T. A. 857; affd., 84 Fed. (2d) 721; certiorari denied, 299 U. S. 588; *A. D. Saenger, Inc.* v. *Commissioner*, 84 Fed. (2d) 23, affirming 33 B. T. A. 135; certiorari denied, 299 U. S. 578; *Rands, Inc.*, 34 B. T. A. 1094; *Nipoch Corporation*, 36 B. T. A. 662.

The net income of petitioner for 1932 was $198,954.14. From this fact it is extremely doubtful that petitioner would have had to sell any securities to pay dividends in 1932, as petitioner contends. This income was derived from dividends and interest on investments totaling $255,043.43, from which is deducted the year's loss from the tobacco business of $56,089.29. Since the investments which produced the income represent in themselves accumulated earnings and gains of prior years, it is obvious that the earnings for the taxable year were earnings from accumulated surplus. It is also apparent that the petitioner corporation from the time of its organization in 1922 did not require in its tobacco business any of the earned surplus or any of the invested capital which it kept in dividend and interest-bearing securities, the cost value of which steadily increased from year to year. There is no evidence that petitioner sold any substantial amount of its securities so as to put its earned surplus in liquid, usable form. A smaller and smaller portion of its capital was used each year for operating expenses and the amount of capital invested in securities increased. It is this evident nonuse of capital invested so largely in securities that gives rise to respondent's claim that petitioner was a holding company and gives importance to the circumstance that the two chief stockholders, Spitzner and Kienbusch, contributed to the partnership, just prior to the incorporation of petitioner, stocks and bonds of values of $109,750 and $606,133.04, respectively, increasing investments in securities and real estate to $1,546,236, compared to the amount of about $500,000 which the partnership previously carried. Kienbusch's contribution represented his entire wealth with the exception of property valued at about $120,000. These contributions relieved the two individuals of surtax liabilities on income from dividends thereafter paid to and accumulated by petitioner. Cf. *Keck Investment Co.*, 29 B. T. A. 143; affd., 77 Fed. (2d) 244; certiorari denied, 296 U. S. 633.

Petitioner claims that the transfer of securities to it by its two chief stockholders, at the end of 1921, was necessary to provide additional capital for the tobacco business. The evidence shows that in

1922, when petitioner did its largest business, the cost of sales of tobacco was in the sum of $2,423,590, which is approximately only two-thirds of the capital of petitioner. Thus, in 1922 there was no evident need for capital in excess of $3,710,000, which would have been the capital of petitioner if the chief stockholders had not made a contribution of securities in the amount of $606,133. Further, the record shows that in 1922 petitioner had more liquid capital than it needed in carrying on the tobacco business in the year of its largest business. Petitioner at the end of 1922 had loaned $800,000 to a concern, S. Rupin, Inc., a corporation in which petitioner owned 50 percent of the outstanding stock. The explanation of loans to tobacco concerns is that such loans were effective in developing and maintaining petitioner's business. However, the record shows that from 1922 to 1932 petitioner made no sales of tobacco to S. Rupin, Inc. Therefore, it is a fair conclusion that the Rupin loan was not made to develop petitioner's business, but as investment in an associated company of a surplus of capital which petitioner did not need in its own tobacco business. It also indicates that petitioner did not need the additional income-producing capital at the date of the formation of petitioner out of the assets of the chief stockholders. The transfer of income-producing securities to a corporation, without proof of the need of such additional assets in the conduct of business, is proof of a purpose on the part of the transferors to use the corporation to avoid payment of surtaxes on their own income. Cf. *United Business Corporation of America* v. *Commissioner*, 62 Fed. (2d) 754; certiorari denied, 290 U. S. 635. Further, in the period 1922 to 1932 the petitioner loaned funds to one of its chief stockholders, Kienbusch, in the years when petitioner paid no dividends, which is further indication that the petitioner was accumulating earnings and gains beyond its reasonable needs.

The following schedule shows the steady increase of investments in stocks and bonds from accumulated earnings and gains:

| Period | Actual cost of stocks, bonds, and mortgages received | Period | Actual cost of stocks, bonds, and mortgages received | Period | Actual cost of stocks, bonds, and mortgages received |
|---|---|---|---|---|---|
| 1-3-22 | $1,249,017.04 | 12-31-25 | $2,069,270.28 | 12-31-29 | $4,987,501.22 |
| 12-31-22 | 1,273,103.11 | 12-31-26 | 2,841,051.19 | 12-31-30 | 4,831,685.37 |
| 12-31-23 | 1,506,807.84 | 12-31-27 | 3,666,204.18 | 12-31-31 | 4,957,415.32 |
| 12-31-24 | 1,579,676.10 | 12-31-28 | 3,801,020.31 | 12-31-32 | 4,936,586.26 |

The explanation given by one of petitioner's chief stockholders for the steady accumulation of earnings is that it was conserving its working capital for use at such time as improved and increased tobacco business would require; that it was hoped and expected that the petitioner's tobacco business would eventually return to an annual

volume of $3,000,000, which would require working capital of about $4,000,000. This explanation is also an argument advanced against the respondent's contention that the petitioner corporation had become a holding company even though it engaged in a tobacco business.

Whether or not the managers of petitioner were optimists, it is evident that a volume of business at $3,000,000 a year was not normal. In one year only, 1922, did gross sales reach that amount. Since the question involved relates to what working capital is necessary for the reasonable needs of the business, the year 1922 is not the normal year to take to test what amount of capital the reasonable needs of the tobacco business requires. The following schedule shows the size of petitioner's business during its life.

| Period | Gross sales | Cost of sales | Inventory |
|---|---|---|---|
| 12-31-22 | $3,006,582.60 | $2,423,590.83 | $953,135.34 |
| 12-31-23 | 2,135,040.43 | 1,638,462.89 | 1,192,489.80 |
| 12-31-24 | 1,977,797.60 | 1,831,599.92 | 616,220.34 |
| 12-31 25 | 1,067,394.26 | 942,226.30 | 388,851.58 |
| 12-31-26 | 926,037.33 | 708,339.24 | 279,837.01 |
| 12-31-27 | 1,428,801.96 | 1,167,308.85 | 664,358.41 |
| 12-31-28 | 1,799,180.21 | 1,456,846.33 | 496,027.15 |
| 12-31-29 | 1,617,869.55 | 1,330,406.62 | 358,134.11 |
| 12-31-30 | 869,901.29 | 796,820.16 | 648,883.30 |
| 12-31-31 | 976,364.53 | 870,134.69 | 294,330.63 |
| 12-31-32 | 557,649.18 | 482,495.62 | 258,994.82 |

In the year 1922, when petitioner's volume of business amounted to $3,000,000, the working capital of the business was $3,490,557.08. From 1927 to 1932 the business of petitioner has never required working capital in excess of $1,900,000. The following table shows the actual working capital in use in each year. It is computed from petitioner's comparative balance sheets by excluding from total assets the book values of the investments in securities and mortgages.

| Period | Working capital, excluding investments in stocks, bonds, mortgages | Period | Working capital, excluding investments in stocks, bonds, mortgages | Period | Working capital, excluding investments in stocks, bonds, mortgages |
|---|---|---|---|---|---|
| 12-31-22 | $3,490,557.08 | 12-31-26 | $2,198,364.64 | 12-31-30 | $1,220,511.72 |
| 12-31-23 | 3,221,313.09 | 12-31-27 | 1,713,429.52 | 12-31-31 | 1,188,380.67 |
| 12-31-24 | 3,109,201.95 | 12-31-28 | 1,900,130.79 | 12-31-32 | 1,262,461.78 |
| 12-31-25 | 2,698,541.34 | 12-31-29 | 1,274,886.02 | | |

From the above, it seems evident that petitioner's normal business did not require maintaining a surplus of earnings that would assure a working capital of $4,000,000 a year. There is little substance in the argument of petitioner that it was accumulating earnings to meet the anticipated needs of its business. The petitioner had substantially no liabilities. In the 10-year period there is no evidence of efforts to increase business to a size that would require use of the

large accumulation of earnings. Cf. *Almours Securities, Inc.*, 35 B. T. A. 61; affd., 91 Fed. (2d) 427; certiorari denied, 302 U. S. 765. In the taxable year 1932 there was a substantial accumulation of earnings that had been turned back into income-producing securities, which had increased during 10 years to a cost value of $4,936,586. The petitioner was in a liquid position. No evidence having been introduced to prove the value of securities at less than cost, it should be held that petitioner had an earned surplus of $2,107,845.88. The evidence does not show that there were reasonable needs for any further accumulation of earnings by preserving the entire net earnings of the taxable year. Cf. *R. & L., Inc., supra.* The earnings for 1932 could as well have been distributed as held for future investment or distribution. Petitioner's turnover of business has been far below its invested capital.

It should be found as a fact that petitioner permitted its gains to accumulate beyond the reasonable needs of the business in 1932. It should further be held that petitioner has not introduced evidence to overcome the prima facie evidence of a purpose to avoid surtax. The analysis of the surplus account of petitioner gives strong support to respondent's contention that it had become a holding company. In every year since 1924 net income received from investments has far exceeded net income from operations, and capital used in operations has steadily been less than capital converted into investments. The following schedule shows this fact and greatly weakens petitioner's argument that the conduct of its operations was solely to further the tobacco business.

| Year | Net income from tobacco operations | Net income other than operations | Net income | Dividends paid |
|---|---|---|---|---|
| 1922 | $351,336.18 | $53,873.81 | $405,209.99 | $60,000 |
| 1923 | 250,238.59 | 64,261.13 | 314,499.72 | 80,000 |
| 1924 | (loss) 12,082.41 | 119,274.83 | 107,192.42 | 40,000 |
| 1925 | (loss) 46,652.77 | 167,233.44 | 120,580.67 | 40,000 |
| 1926 | 45,201.67 | 270,793.73 | 315,995.40 | 80,000 |
| 1927 | 59,433.95 | 255,350.59 | 314,784.54 | 120,000 |
| 1928 | 101,801.49 | 366,475.61 | 468,277.10 | 120,000 |
| 1929 | 87,407.46 | 307,879.41 | 395,286.87 | 80,000 |
| 1930 | (loss) 73,175.77 | 289,661.33 | 216,485.56 | 40,000 |
| 1931 | (loss) 35,999.49 | 239,269.62 | 203,270.13 | |
| 1932 | (loss) 56,089.29 | 255,043.43 | 198,954.14 | |
| Total | 671,419.61 | 2,389,116.93 | 3,060,536.54 | 660,000 |

Petitioner claims that because of the shrinkage in values of its assets it had no surplus out of which to pay dividends in 1932 and that to do so would have been in violation of section 58 of the New York State Stock Corporation Law and section 164 of the Penal Law. Petitioner relies on certain advice given him by an attorney. This attorney appeared as a witness. His testimony, on cross-examination, shows that his opinion was given without examining

the books of the corporation and without knowledge of whether payment of a dividend would have impaired capital. He admitted that, where there is a close corporation and no creditors (the petitioner had only $220,000 current liabilities and $434,000 in cash), and the stockholders agree to the distribution, it is inconceivable that there could be "injury" from payment of a dividend and hence no penalty under the New York statute for distributing dividends. There is no evidence in this proceeding that the security assets of petitioner were in fact of the book value in 1932 ascribed to them by petitioner in its own "write-down" of values. Nor is there any evidence that the value of the security investments was less than cost. The surplus of $318.12 for 1932 is a result of bookkeeping and creates nothing. As stated in *Sitterding* v. *Commissioner*, 80 Fed. (2d) 939, "mere bookkeeping entries cannot preclude the government from collecting its revenues, nor are such entries conclusive upon the taxpayer." It is exceedingly doubtful whether payment of a dividend would have impaired capital and consequently doubt that there was any statutory bar against payment of a dividend by petitioner in 1929. In an issue of this kind, claimed shrinkage of values in assets as a bar to paying dividends is a fact to be proved, and that fact apparently has not been proved here.

In conclusion, it is the opinion of this dissenting view that the penalty prescribed by section 104 should be imposed upon the petitioner.