APOLLO INDUSTRIES, INC., SUCCESSOR TO A & F, INC. (FORMERLY ALLES & FISHER, INC.), PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 723–63.   Filed April 2, 1965.

*Lawrence M. Levinson, Jack H. Calechman,* and *Stephen N. Subrin,* for the petitioner.

*John R. Berman,* for the respondent.

1

3

10

## OPINION

TURNER, *Judge:* Under sections 531 and 532 of the Internal Revenue Code of 1954, an accumulated earnings tax is imposed upon a corporation "formed or availed of for the purpose of avoiding the income tax with respect to its shareholders * * * by permitting earnings and profits to accumulate instead of being divided or distributed." In section 533 it is provided that "the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary." By section 537 it is further provided that "the term 'reasonable needs of the business' includes the reasonably anticipated needs of the business."

The issue for decision is whether the petitioner's predecessor, Alles & Fisher, Inc., was availed of during 1956 and 1957 for the purpose of avoiding the income tax with respect to its shareholders within the meaning of the above sections. The respondent concedes on brief that Alles was not so availed of during the taxable period from January 1, 1958, through June 30, 1958.

The petitioner contends that the earnings and profits of Alles for the years 1956 and 1957 were not permitted to accumulate beyond the reasonable needs of the business. It maintains that the accumulations were required in order to allow Alles to enter the manufacture of reconstituted tobacco and to meet ordinary business needs.

It is the respondent's contention that Alles' plans for entering the manufacture of reconstituted tobacco were not specific, definite, and feasible during the taxable years in question and hence may not be relied upon to justify the accumulations.

Much of the evidence presented by the petitioner and much of the discussion in its brief are concerned with establishing the definiteness during the years in issue of its plans for manufacturing reconstituted tobacco. In our Findings of Fact we have set forth in considerable detail the facts with respect to the alleged plans. We do not, however, find it necessary to decide whether those plans were sufficiently specific, definite, and feasible, because in any event the facts show that sufficient funds were available to the corporation to cover the alleged needs for the project without accumulating any earnings for 1956 or 1957.

The facts show that in June 1955, Alles obtained an estimate that the equipment necessary for the production of reconstituted tobacco would cost approximately $193,145. Gryzmish testified that after receiving the estimate and an accompanying plant layout he estimated that the cost of providing a building of the dimensions needed would make the total cost of the project "around one half a million dollars." The petitioner has made its computations and based its arguments on brief primarily on the proposition that the amount needed for the project was $500,000.

Taking into consideration, therefore, an assumed need for $500,000 for the reconstituted tobacco project, we turn to a consideration of the funds on hand during the taxable years to meet Alles' needs. Based upon the balance sheets shown in its returns, Alles had working capital of $1,299,357.49 as of December 31, 1956, and $1,332,498.74 as of December 31, 1957.[5]

In determining the working capital, we have included the note receivable from Gryzmish as of December 31, 1957, in the amount of $160,000 as a current asset, even though it is not regarded as such

---

[5] The securities owned by Alles were shown on the balance sheets in the tax returns at $516,886, their cost to the corporation, as of Dec. 31, 1956, and Dec. 31, 1957. On the other hand, the corporation's audited financial statements for those years, which are in evidence, contain "comments" to the effect that the securities had a "market" value of $527,297.50 at Dec. 31, 1956, and $433,920.95 at Dec. 31, 1957. The certified public accountant who prepared the statements testified that he had ascertained the market price of the securities as of the specified dates and the amounts were as reported in the statements. Since, in computing working capital, we are concerned with the assets available to meet business needs, the true market value would be a much more meaningful figure than cost. Cf. *C. H. Spitzner & Son, Inc.*, 37 B.T.A. 511. We have, therefore, given the petitioner the benefit of the doubt as to the evidence by using in our computations the lower of the cost or "market" figures for each year (i.e., $516,886 as of Dec. 31, 1956, and $433,920.95 as of Dec. 31, 1957).

in Alles' 1957 financial statement. Gryzmish testified that he was in a position to repay the loan at any time and that he would have repaid it "in a minute's notice" had the corporation requested. The loan was in fact repaid on or about May 27, 1958. For these reasons, we conclude that the note may properly be considered a current asset for our purposes as of December 31, 1957. Indeed, had the circumstances been otherwise than they were, the existence of such an outstanding loan to the principal shareholder, without security or interest, might be strong evidence of the purpose proscribed by the statute. Sec. 1.533–1(a)(2), Income Tax Regs.

Alles had current assets of $1,897,499.94 at December 31, 1956, and $1,609,729.37 at December 31, 1957, as compared with current liabilities at those dates of $598,142.45 and $277,230.63. Of noteworthy significance, we think, is the fact that of the current assets at those dates, $817,916.29 at December 31, 1956, and $1,030,291.57 at December 31, 1957, were in highly liquid form, i.e., cash, accounts receivable (net), the note receivable from Gryzmish, and securities.

The reason for the substantial increase in liquidity during 1957 is readily apparent from the record. During the taxable years Alles embarked upon a program of reducing its large inventory of broadleaf tobacco, the maintenance of which was made unnecessary by its plan to use reconstituted tobacco in its cigars. According to Gryzmish's testimony, the reductions were made in order to provide funds for the proposed new plant and equipment. Alles' balance sheets show that the total inventory was reduced from $1,079,583.65 at December 31, 1956, to $579,437.80 at December 31, 1957, and that the more liquid assets were increased accordingly. It thus appears that the reduction in inventory alone provided $500,000 in additional liquid funds, an amount equal to the claimed needs for the reconstituted tobacco project. The substantial increase in the available liquid funds was apparent as of the end of 1957, and from all indications in the record should have been reasonably anticipated as of the end of 1956.

Giving full effect to the claimed needs for the reconstituted tobacco project, it is apparent that Alles could have distributed its earnings for 1956 and 1957 to its shareholders and still have maintained a substantial working capital.

The petitioner maintains, however, that additional funds were required for ordinary business operations. As evidence of this alleged need, the petitioner presented certain testimony and computations by the certified public accountant who had prepared Alles' financial statements. The accountant applied what he termed a "rule of thumb" and added, for each of the taxable years in question, amounts equal to the closing accounts receivable, the closing inventory, the total operating expenses for the year (excluding depreciation), and the fixed assets acquired during the year, to arrive at a figure purportedly represent-

ing the amount of capital needed for Alles' operations. He testified that his computations had been prepared in connection with the trial of this case, having been "thought of by our attorney," and there is no indication that any similar analysis had been made for Alles during the taxable years.

Working capital needs of businesses vary, being dependent upon such factors as the nature of the business, its credit policies, the amounts of inventories and rate of turnover, the amount of accounts receivable and the collection rate thereof, the availability of credit to the business, and similar relevant factors. *Smoot Sand & Gravel Corp.* v. *Commissioner*, 241 F. 2d 197, 207. "Rules of thumb" may be helpful, but the search must always be concerned with the needs of the particular business as they existed during the particular year. *Dixie, Inc.* v. *Commissioner*, 277 F. 2d 526, 528, affirming 31 T.C. 415; *Barrow Mfg. Co., Inc.* v. *Commissioner*, 294 F. 2d 79, 81, affirming a Memorandum Opinion of this Court; *Motor Fuel Carriers, Inc.* v. *United States*, 322 F. 2d 576.

The evidence of record does not support the accountant's analysis, which, among other things, assumed that sufficient funds had to be available to pay operating expenses for an entire year.

It appears that Alles' accounts receivable were normally collected in the ordinary course of business within relatively short periods of time. The aging schedules in Alles' financial statements show that approximately 80 percent or more of the closing accounts receivable for 1956 and 1957 were less than 1 month old and that accounts more than 3 months old were negligible. Bad debt losses were minimal. Insofar as the record indicates, Alles' inventory of finished cigars was "turned over" regularly in the ordinary course of business and, as previously stated, the inventory of tobacco was substantially reduced during 1957. There is no suggestion that any business difficulties were anticipated. The record indicates that Alles had a healthy, going business which would of its own accord generate substantial funds through its normal operations in the course of a year. As such, an assumption that sufficient capital was required in advance to cover operating expenses for an entire year is not warranted.

The petitioner may not rely merely upon a rule of thumb to establish its alleged needs for working capital where the evidence not only does not support the method employed, but requires a contrary conclusion. We do not regard our decisions in *J. L. Goodman Furniture Co.*, 11 T.C. 530, and *F. E. Watkins Motor Co.*, 31 T.C. 288, cited by the petitioner, as holding otherwise.

We have carefully considered the accountant's computations and testimony in light of the record as a whole and have not found them to be convincing evidence of the amount of working capital required in Alles' business.

On the basis of all of the evidence of record, including the evidence concerning Alles' ordinary business operations and the claimed needs pursuant to the plans to manufacture reconstituted tobacco, we have concluded and found as a fact that the earnings and profits of Alles during the taxable years 1956 and 1957 were accumulated beyond the reasonable needs of its business.

Under section 533 (a) a finding that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business is deemed determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation proves to the contrary by the preponderance of the evidence.

The petitioner maintains that the avoidance of income tax with respect to its shareholders was not Alles' purpose in accumulating the earnings in question.

The facts show that Gryzmish controlled the affairs of Alles during the taxable years, and the respondent agrees that "the acts of Reuben B. Gryzmish were the acts of Alles & Fisher, Inc." Gryzmish testified that the avoidance of income tax with respect to the shareholders was not his purpose for having Alles accumulate its earnings for 1956 and 1957. He testified that the entering of the manufacture of reconstituted tobacco was his primary motive, and he also mentioned certain additional alleged reasons for such accumulations.

Gryzmish testified that, in addition to the purported needs for the reconstituted tobacco project, another reason why he kept Alles from paying dividends with respect to the earnings for 1956 was that he did not believe that his brother Mortimer was entitled to receive any dividends after Mortimer's refusal to transfer his shares of Alles stock to Gryzmish in accordance with their agreement. This explanation fails to impress us. Had a dividend been declared, Gryzmish, who admittedly had working control of the corporation, undoubtedly could have seen to it that no dividends were paid to Mortimer until the disputed ownership of the stock was resolved. Furthermore, it is apparent that the dispute was settled by February 12, 1957, the date when Mortimer resigned as a director of the corporation, and apparently it was settled even earlier, since Gryzmish and Mortimer signed mutual releases against each other on January 27, 1957. Therefore, even after the dispute was settled, ample time remained for the payment of a dividend with respect to the 1956 earnings.[6]

---

[6] It is provided in sec. 535 (a) that in arriving at "accumulated taxable income" (upon which the accumulated earnings tax is levied) the taxable income of the corporation must be reduced by, among other things, the "dividends paid deduction." Under secs. 561 and 563 (a), the dividends paid deduction, for purposes of the accumulated earnings tax, includes not only dividends paid during the taxable year but also those paid "after the close of any taxable year and on or before the 15th day of the third month following the close of such taxable year." Alles having been on a calendar year basis, any dividends paid on or before Mar. 15, 1957, would have reduced its "accumulated taxable income" for 1956.

The petitioner emphasizes another alleged reason why no dividends were paid with respect to the 1957 earnings. The reason offered is that at a meeting held on October 9, 1957, Gryzmish assented to a request made by George Friedlander, a representative of National Associates, that no dividends be paid by Alles pending the outcome of negotiations for the sale of the Alles stock owned by the Gryzmish family group to National Associates. The petitioner does not contend that there was at any time any legal obligation on Alles to forego the payment of dividends, but cites testimony of Gryzmish to the effect that he felt "morally bound" to see that the corporation did so because of his statement to Friedlander.

In our opinion, the reason offered for the failure to pay dividends is not inconsistent with a purpose to avoid income tax with respect to the shareholders. If the earnings of the corporation were accumulated so that its controlling shareholders could sell their stock and thereby transform what would otherwise be ordinary income to them into capital gain, this seems to present a classic example of a purpose to avoid the income tax with respect to the shareholders.

Moreover, the facts of record do not in our opinion warrant giving Gryzmish's statement to Friedlander the significance which the petitioner would have us attach to it. The meeting on October 9, 1957, which was the first meeting between Gryzmish and representatives of National Associates, was apparently merely a preliminary discussion at which the possibility of a sale of the Alles stock held by the Gryzmish family was explored. At the time, a recent balance sheet of the corporation was not even available for Friedlander's inspection. Friedlander requested a balance sheet of Alles as of September 30, 1957, which was subsequently prepared by the accountants and furnished to him. He also requested Gryzmish to see that, pending the outcome of the negotiations, Alles would engage in no transactions out of the ordinary course of business, such as the acquisition of substantial physical assets or the payment of dividends. Gryzmish agreed to the requests.

The record shows, however, that no purchase agreement was executed until June 20, 1958, at which time the transaction was consummated. This was more than 8 months after the initial meeting. The existence of a firm understanding between the Gryzmish group and National Associates at any time prior to the actual execution of the agreement has not been shown. In his testimony, Friedlander said that Gryzmish had not been an "anxious seller" and described the negotiations as "chase and go." He also testified that he thought "it was like in April of 1958 when we learned that he [Gryzmish] was negotiating or selling with somebody else." The facts show that

on April 10, 1958, a corporation named Waitt & Bond, Inc., made a written offer to purchase the stock of Alles owned by Gryzmish and his family, and that this offer was not accepted.

The purchase price, a prime factor in any transaction, was apparently unsettled for a considerable period of time. We cannot determine from the record how soon before the execution of the agreement the actual purchase price, which turned out to be $31 per share, was agreed upon. Although Friedlander testified that he had a "feeling" that the final purchase price was agreed upon "sometime in December," this testimony is contradicted by the fact that a draft of a proposed agreement sent to Gryzmish on January 9, 1958, provided for a purchase price of $30 per share, which, of course, was lower than that in the final agreement. Being in a constant state of flux, as the negotiations seem to have been, the purchase price could have been adjusted to take into consideration any distributions of dividends to the shareholders in the interim.

The petitioner points out that in both the proposed draft of the purchase agreement sent to Gryzmish on January 9, 1958, and the actual agreement of June 20, 1958, there were provisions whereby the sellers warranted that since the date of a balance sheet attached to the agreement (Sept. 30, 1957, in the former case and Dec. 30, 1957, in the latter) Alles had paid no dividends. We do not regard this as significant. It is understandable that National Associates, which was purchasing the controlling interest in Alles in reliance upon a prior balance sheet of the corporation, would require a warranty that the assets shown on the balance sheet were not depleted since the date thereof by the payment of dividends. This does not necessarily mean, however, that it would not have purchased the stock if dividends had been paid, so long as it was apprised of the situation and the purchase price was reduced accordingly. In this regard, Friedlander testified merely that he would expect that the purchase price of the shares would be reduced by at least the amount of any dividends paid.

In view of the record, we cannot find that Gryzmish's assent to Friedlander's request at their initial meeting shows that the avoidance of income tax with respect to the shareholders was not the purpose for the accumulation of the 1957 earnings.

The petitioner also stresses the fact that the 1956 and 1957 income tax returns of Gryzmish and each of the members of his family who were shareholders of Alles show charitable contributions which, in varying degrees, exceeded the applicable limitations for deductibility. Therefore, any additional income received by one of these individuals would have been offset by additional deductions for charitable con-

tributions equal to 30 percent [7] of the additional income. This, of course, would reduce the tax on additional income, but would far from eliminate it. According to schedules prepared by the petitioner's accountants and introduced into evidence by the petitioner, the additional income tax which would have been paid by Gryzmish and the members of his family who were shareholders, if the net earnings for 1956 and 1957 after taxes had been paid out as dividends, would have been approximately $9,411.63 in 1956 and $41,575.18 in 1957. Certainly these are not insignificant amounts.

The petitioner seems to argue, however, that the Gryzmish group of shareholders did not actually avoid any income taxes because any tax savings they enjoyed by not receiving dividend distributions with respect to the 1956 and 1957 earnings were later offset by increased capital gains tax on the sale of their stock, which presumably commanded a higher price by reason of the accumulated earnings. The schedules prepared by the petitioner's accountants compare the aforesaid figures as to taxes saved by the shareholders with other figures purportedly representing the amounts by which the capital gains taxes paid by the shareholders were increased because of the accumulated earnings.

The argument is not persuasive. The schedules introduced by the petitioner are based upon conjecture as to the effect that distributions would have had upon the price the shareholders could receive for their stock and upon tax returns of the shareholders which are not even in evidence. The issue is the purpose of the corporation in accumulating the earnings. *Helvering* v. *National Grocery Co.*, 304 U.S. 282. At least with respect to the 1956 earnings, the record does not indicate that, at the time the earnings were accumulated, the possibility that the tax savings to the Gryzmish family group might be offset by future capital gains taxes was even contemplated, since there apparently was no thought by them of selling their stock in Alles. Gryzmish himself testified that prior to the suggestion by Gerald Glunts in September 1957, that he meet with Friedlander, he had not asked Glunts or anyone else to find a purchaser for the stock in Alles owned by him or his family.

With respect to the 1957 earnings, under the petitioner's own calculations the amounts of additional tax which the Gryzmish group would have paid had the earnings been distributed exceeded the amount of

---

[7] Sec. 170(b)(1)(B) imposes a general limitation of 20 percent of an individual's adjusted gross income (computed without regard to any net operating loss carryback) as the amount which he may deduct for charitable contributions during the taxable year. Sec. 170(b)(1)(A), however, allows the deduction of an additional 10 percent of adjusted gross income for charitable contributions by an individual to certain specified types of organizations, with the consequence that a total deduction of up to 30 percent of adjusted gross income is possible for individuals who contribute at least 10 percent of their adjusted gross income to the types of organizations specified in sec. 170(b)(1)(A). According to the returns, the contributions made by the individuals in question entitled each of them to the maximum 30-percent limitation, and the returns are not disputed by the respondent.

the purported "additional" capital gains tax paid by them by reason of the accumulation of the earnings for that year.

Even if this were not so, there was in any event a deferral of taxes from the years when the shareholders would have paid income tax on any dividends received to the subsequent time when they paid the capital gains tax by reason of the sale of their stock.[8]

In our opinion, the petitioner has failed to establish by a preponderance of the evidence that Alles was not availed of during the years in question for the purpose of avoiding the income tax with respect to the shareholders. Accordingly, the respondent's determination of liability for the accumulated earnings tax for the taxable years 1956 and 1957 must be sustained.

*Decision will be entered under Rule 50.*

---

[8] The record does not indicate whether the entire capital gain was reported by all the shareholders on their returns for 1958, the year in which the stock was sold, or whether perhaps some of the shareholders who did not receive full payment at the time of the sale deferred the reporting of a portion of their gain to subsequent years under the installment sale provision of sec. 453 of the Code. No returns for the shareholders for 1958 or any subsequent year are in evidence. The accountant who prepared the schedules introduced testified merely that the figures were based on "the tax returns of each of the taxpayers for the years when the gain on the sale of the stock of Alles & Fisher, Incorporated, had been reported."