Joseph Starr v. Commissioner.Starr v. CommissionerDocket No. 24672.United States Tax Court1954 Tax Ct. Memo LEXIS 260; 13 T.C.M. (CCH) 277; T.C.M. (RIA) 54093; March 30, 1954*260 Upon the facts, it is held: (1) That Starr Pen Company, a partnership in which petitioner was a member in 1943, sold for cash in November 1943, 100 gross of merchandise to King, Larson, and McMahon for $7,100. (2) That King, Larson, and McMahon made cash payments to petitioner and his brother for Starr Pen Company in 1943 for merchandise sold by Starr Pen Company in the total amount of $235,198.80, which was in addition to other amounts paid to Starr Pen Company in payment of invoices. (3) That the income derived from all of the cash payments accrued to Starr Pen Company in the amounts of $66,448.80, and $175,850 in its fiscal periods ended 6/30/43 and 1/31/44, respectively. (4) That Starr Pen Company did not report in its returns for the periods ended 6/30/43 and 1/31/44, the amounts of $66,448.80 and $175,850. (5) That petitioner's distributive share as a partner of the above income which accrued to Starr Pen Company was $46,514.60 in 1943, and $123,095 in 1944, and that petitioner omitted his share in his income tax returns for 1943 and 1944. (6) That part of the deficiency for each of the years 1943 and 1944 was due to fraud with intent to evade tax under section 293 (b) of the*261 Code. Jack H. Oppenheim, Esq., for the petitioner. George T. Donoghue, Jr., Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner originally determined deficiencies in income tax for the years 1942-1946, inclusive, to which he added 50 per cent additions under section 293 (b), Internal Revenue Code, upon his determination that part of the deficiency for each year was due to fraud with intent to evade tax, as follows: YearDeficiencySec. 293(b)1942$ 30,511.16$ 15,255.581943165,846.6182,923.311944578,032.66289,016.331945121,685.0560,842.53194687,609.4643,804.73The Commissioner originally determined that*262 Starr Pen Company, a partnership, was not a bona fide partnership and that under the provisions of section 22 (a) of the Code all of the net income of Starr Pen Company was taxable to petitioner. The Commissioner has stipulated that Starr Pen Company shall be recognized as a bona fide partnership with recognizable partners, and that, accordingly, petitioner is taxable upon his distributive share of the net income of the partnership for each of its taxable years. His interest in the partnership was not the same in every year. The parties have entered into stipulations which dispose of certain issues raised by the pleadings. Effect will be given to the stipulations under Rule 50. By amendments to his answer, the Commissioner now claims deficiencies in income tax and additions to deficiencies under section 293 (b) of the Code as follows: YearDeficiencySec. 293(b)1942NoneNone1943$ 76,917.64$ 38,458.821944208,325.36104,162.68194538,868.47None194634,192.45NoneThe questions to be decided relate to the years 1943 and 1944. It has been stipulated that in those years petitioner had a 70 per cent interest in the Starr Pen Company partnership. *263 The questions are as follows: (1) Whether income accrued to Starr Pen Company, which was not reported, during its accounting periods ending on June 30, 1943, and January 31, 1944, in the amounts of $66,448.80 and $175,850, respectively. The Commissioner has determined that such income accrued to the partnership, and was paid in 1943. He has determined that petitioner is taxable upon his share of the adjusted partnership income under the provisions of section 182 of the Code in the amounts of $46,514.60 for the calendar year 1943, and $123,095 for the calendar year 1944. (2) Whether any part of the deficiencies for each of the years 1943 and 1944, if any, is due to fraud with intent to evade tax under section 293 (b) of the Code. Findings of Fact Petitioner is a resident of Chicago, Illinois. He reported his income for 1943 and 1944 on the cash basis. He filed his returns with the collector for the first district of Illinois. During 1943 and 1944, the members of and the interests of the members of the partnership, Starr Pen Company, were the petitioner, 70 per cent; Samuel Starr, 15 per cent; and Jack Starr, 15 per cent. The distributive income of the partnership was its*264 net income after allowances for salaries of the partners. Starr Pen Company had accounting periods as follows: February 1, 1943, to June 30, 1943; July 1, 1943, to January 31, 1944. During these accounting periods it kept its accounts and reported its income on an accrual basis. The Starr Pen Company was organized in 1935 by members of the Starr family, including petitioner's father and mother. Petitioner's father died before 1942, and his mother died in 1942. Petitioner has three brothers, William, Samuel, and Jack. William was a member of the partnership prior to February 1, 1943. He withdrew from the partnership. The business of Starr Pen Company is the sale at wholesale of fountain pens and sets of fountain pens and mechanical pencils. It does not manufacture any of the merchandise which it sells. In November 1941, Starr Pen Company purchased the assets of the Conlkin Pen Company, which had been engaged in the business of manufacturing and selling fountain pens with gold pen points (which are also called "nibs"). The assets purchased consisted of the good will, trade name, trade-marks, patents, and tools and dies of Conklin Open Company. During 1942, 1943, and 1944, Starr*265 Pen Company did business under the names "Conklin Pen Company," and "Starr Pen Company." Conklin Pen Company is a division of Starr Pen Company. Merchandise sold under the name "Starr Pen Company" was invoiced under that name, and merchandise sold under the name "Conklin Pen Company" was invoiced under that name. Starr Pen Company, in 1942, sold inexpensive fountain pens with steel nibs. In 1942, approximately 88 per cent of fountain pens manufactured in the United States were fitted with steel nibs, and about 12 per cent were fitted with gold nibs. United Advertising Company is a corporation having its principal place of business in Chicago. Its stock was owned by Edward H. Larson, Nelson J. McMahon, and McMahon's wife. Nelson J. McMahon was its president, and Edward H. Larson was its vice president. It was in existence and carried on its business in 1940, 1941, 1942, 1943, and 1944. Its business was the operation of an advertising agency. Its offices were located at 205 N. Michigan Avenue, Chicago. United Advertising Company had a division, known as Penman Company, which conducted a retail mail order business in inexpensive fountain pens maufactured by others. It sold pens*266 under the name of "Penman." The office of Penman Company was located at 179 N. Michigan Avenue, Chicago, in 1942. Martin P. King, in 1939, carried on a business of selling low-priced fountain pens. In 1940 and 1941, he was a salesman for Starr Pen Company. He made sales on behalf of Starr Pen Company to United Advertising Company, and he became acquainted with Larson and McMahon. At the end of 1941, United Advertising Company offered employment to King which he accepted, and in 1942, King became the manager of the Penman division of United Advertising. He received a salary of 50 per cent of the profits of Penman division. In 1942, Penman division purchased pens from several concerns including Starr Pen Company. William Starr was then the sales manager of Starr Pen Company. Leo Ungar, in 1942, was the head of an organization of sales representatives with contacts throughout the United States. His sales organization sold the products of various manufacturers on a commission basis. Ungar's sales organization made sales to many of the largest jobbing concerns in the country. Also, Ungar was vice president of Northwestern Products Company of St. Louis which manufactured toys and games. *267 King became acquainted with Leo Ungar in the summer of 1942. In July 1942, Ungar became sales manager of the Penman Company. In the summer of 1942, Starr Pen sold a pen with a steel nib, a Conklin pen, which it offered to sell for one dollar. It was manufactured for Starr Pen. In September 1942, Starr Pen agreed with King to sell this pen to the Penman Company on a commission basis, agreeing to pay Penman a commission of 16 3/4 per cent of sales. The agreement was for a period ending on December 31, 1942. Penman was to use Ungar's sales organization, paying Ungar and his salesmen commissions on sales. It was agreed that Penman would secure orders and turn them over to Starr Pen; Starr Pen would fill the orders, make shipments directly to purchaser, and would send bills to the purchasers. Early in 1942, the War Production Board issued an order limiting the manufacture of fountain pens and prohibiting the use of steel in the manufacture of pen points. As a result of this order, a shortage of fountain pens developed in the United States. The shortage existed in 1942 and it became acute in 1943. In the summer of 1942, Penman Company gave up its retail mail order business in fountain*268 pens because of the shortage. For the rest of 1942, it sold at wholesale to jobbers whatever "Penman" pens, and other pens it could purchase. The agreement of Starr Pen with Penman Company was not renewed after December 31, 1942, but Starr Pen continued to sell fountain pens to Penman until some time in February 1943, until its supply of fountain pens was exhausted. On January 1, 1943, Martin King, his wife, Ruth King, McMahon, and Larson formed a partnership, King, Larson, and McMahon, hereinafter referred to as K.L. & M., to engage in the business formerly conducted by the Penman Company. Each partner had a 25 per cent interest. The offices of the partnership were located at 179 N. Michigan Avenue, Chicago. Prior to December 1942, petitioner and William Starr, for Starr Pen Company, made arrangements with Paramount Pen Company, North Bergen, New Jersey, one of its suppliers, to manufacture two types of fountain pens for Starr Pen Company, one to contain a large gold nib and the other to contain a smaller gold nib. Starr Pen Company had Paramount Pen Company purchase $70,000 worth of celluloid of high quality to be used in the manufacture of these fountain pens. Starr Pen Company*269 made arrangements with Keller Gold Pen Company, Toledo, Ohio, to manufacture for the Starr Pen Company large gold nibs stamped with the name Conklin Pen Company. These gold nibs were to be manufactured with the same tools and dies which the Keller Gold Pen Company had used in the manufacture of gold nibs for the Conklin Pen Company prior to the time when Starr Pen Company had acquired the right to use the name Conklin Pen Company. These gold nibs were to be manufactured at the rate of 5,000 each week. Starr Pen Company also made arrangements with Radiant Pen Point Company, New York City, to manufacture for Starr Pen Company, at the rate of 5,000 each week, smaller gold nibs containing a lesser percentage of gold and stamped with the name Conklin Pen Company. All the gold nibs contracted for by Starr Pen Company were delivered to the Paramount Pen Company and fitted by the latter into the two types of fountain pens it had agreed to manufacture for Starr Pen Company. Beginning in December 1942, and continuing through the months of January, February, March and April, 1943, Starr Pen Company received from Paramount Pen Company, at the rate of 10,000 each week, completed fountain pens of*270 the two types the latter had agreed to manufacture for the former. In the first week in March 1943, petitioner and King met in the former's office at Starr Pen Company, 500 N. Dearborn Street, Chicago. At that time petitioner showed King an oversize fountain pen with a large gold nib bearing the name Conklin, a set consisting of the same type fountain pen and a matching mechanical pencil, and a set consisting of a thinner fountain pen with a smaller gold nib bearing the name Conklin and a matching mechanical pencil. The two types of fountain pens were the types which Starr Pen Company had been purchasing from Paramount Pen Company. Petitioner designated the large fountain pen with the symbol 5D, the set consisting of the large fountain pen and matching pencil with the symbol 8S, and the set consisting of the smaller fountain pen and matching pencil with the symbol 5S. Petitioner stated that the 5D pen had a retail list price of $5, the 8S pen and pencil set a retail list price of $8.50, and the 5S pen and pencil set a retail list price of $5. The retail list price was the amount to be paid for the item by a person purchasing it from a retail merchant. Petitioner, on behalf of Starr*271 Pen Company, discussed selling to K.L. & M. large quantities of the 5D pen, the 8S pen and pencil set, and the 5S pen and pencil set at the following prices: The 5D pen, at an invoice price of $1.12 1/2 for each unit, which was to be paid by check, plus a "royalty" of $.60 for each unit, which was to be paid in cash, or a total price of $1.72 1/2 for each unit. The 8S pen and pencil set, at an invoice price of $1.91 1/2 for each set, which was to be paid by check, plus a "royalty" of $1 for each set, which was to be paid in cash, or a total price of $2.91 1/2 for each set. The 5S pen and pencil set, at an invoice price of $1.12 1/2 for each set, which was to be paid by check, plus a "royalty" of $.60 for each set, which was to be paid in cash, or a total price of $1.72 1/2 for each set. Petitioner stated that the "royalties" were to be charged for making K.L. & M. the exclusive distributor of these pens and pen and pencil sets. Petitioner told King that K.L. & M. were to sell these pens and pen and pencil sets only to jobbing concerns. He stated that K.L. & M. were to sell the 5D pen for $2.25 for each unit, the 8S pen and pencil set for $3.82 1/2 for each set, and the 5S pen and pencil*272 set for $2.25 for each set. The price at which the pen and the pen and pencil sets were to be sold to jobbers was computed as follows: 5D8S5SRetail list price$5.00$8.50$5.0050 per cent discount2.504.252.50$2.50$4.25$2.5010 per cent discount.25.42 1/2.25Selling price to job-bers$2.25$3.82 1/2$2.25 Petitioner told King that under his tentative proposal, K.L. & M's. per cent of profit on selling price would approximate the per cent of the commissions Penman Company had made on the sale of the $1 Conklin pen. In the fountain pen business, it is customary to determine the price at which merchandise is sold to a jobber or a retailer by computing certain customary discounts from the retail list price. In that business it is customary to determine the price at which merchandise is sold to a jobber by subtracting from the retail list price 50 per cent and then subtracting 10 per cent from the remainder or by subtracting from the retail list price 40 per cent and then subtracting 25 per cent from the remainder. Either computation results in the same price at which merchandise is sold to a jobber. A retailer customarily buys*273 merchandise at a discount of 40 per cent from the retail list price. Petitioner and King continued discussing petitioner's tentative proposal with reference to the 5D pens and the 8S and 5S pen and pencil sets throughout the month of March 1943. King kept Nelson J. McMahon and Edward H. Larson advised of these discussions. On approximately April 15, 1943, petitioner, on behalf of Starr Pen Company, and King, on behalf of K.L. & M. entered into an oral agreement under which Starr Pen Company would sell K.L. & M. large quantities of the 5D pen and the 8S and 5S pen and pencil sets at the prices discussed by petitioner in his meeting with King in the first week in March 1943. At some later time, between April 10, 1943, and April 27, 1943, petitioner and King met in the former's office at Starr Pen Company. At that time, petitioner and King agreed that Starr Pen Company would sell K.L. & M. quantities of fountain pens with steel nibs, designated by K.L. & M. with their symbol 225X, and sets consisting of a fountain pen with a steel nib and a matching mechanical pencil, designated by K.L. & M. with their symbol 4A or 4N, at the following prices: The 225X fountain pens at an invoice*274 price of $26.50 per gross, which was to be paid by check, plus an additional amount of $36 per gross, which was to be paid with cash, or at a total price of $62.50 per gross; and the 4A and 4N pen and pencil sets at an invoice price of $43 per gross, which was to be paid by check, plus an additional amount of $72 per gross, which was to be paid with cash, or at a total price of $115 per gross. The individual fountain pens and those in the sets were to be the same type as those Starr Pen Company had sold the Penman Company in 1942. K.L. & M. was then paying its other suppliers $62 and $63 per gross for the 225X fountain pen. After they had been received from Starr Pen Company, K.L. & M. sold the 225X fountain pens and the 4A and 4N pen and pencils sets under the Penman name to jobbers at prices determined by K.L. & M. The 225X pens were sold at a price of approximately $97 per gross while the 4A and 4N pen and pencil sets were sold at a price of approximately $255 per gross. In addition to the amounts paid Starr Pen Company for the 4A and 4N pen and pencil sets, K.L. & M. paid other suppliers $36 per gross for leather cases for single pens and approximately $14.40 per gross for boxes*275 for the sets. Early in June 1941, petitioner and King agreed that Starr Pen Company would sell K.L. & M. quantities of a Conklin fountain pen designated by petitioner with the symbol 3D and given by petitioner a retail list price of $2.95, and a Conklin set consisting of a fountain pen and matching mechanical pencil designated by petitioner with the symbol 3S and given by petitioner a retail list price of $3.95. It was agreed that the 3D fountain pen and the 3S pen and pencil set would be sold by Starr Pen Company to K.L. & M. at the following prices: The 3D pen, at an invoice price of $.54 for each unit, which was to be paid by check, plus a "royalty" of $.50 for each unit, which was to be paid in cash, or a total price of $1.04 for each unit. The 3S pen and pencil set, at an invoice price of $.75 for each set, which was to be paid by check, plus a "royalty" of $.60 per set, which was to be paid in cash, or a total price of $1.35 for each set. It was agreed that K.L. & M. would sell the 3D pen and the 3S pen and pencil set to jobbers at the retail list price less the customary discount of 50 per cent and 10 per cent of the remainder, or at a price of $1.33 for each 3D pen and a*276 price of $1.78 for each 3S set. The following tabulation shows the gross profit K.L. & M. would make per unit or per set on the Conklin pens and pen and pencil sets under the agreements entered into between King and petitioner: 5D8S5S3D3SSelling price$2.25$3.82 1/2$2.25$1.33$1.78Invoice price$1.12 1/2$1.91 1/2$1.12 1/2$ .54$ .75Cash "royalty".601.00.60.50.60Total cost$1.72 1/2$2.91 1/2$1.72 1/2$1.04$1.35Gross profit$ .52 1/2$ .91$ .52 1/2$ .29$ .43Percentage of gross profit on cost30.4%31.2%30.4%27.8%31.8%Percentage of gross profit on sellingprice23.3%23.8%23.3%21.8%24.2%The following tabulation shows the gross profit Starr Pen Company would make per unit or per set on the Conklin pens and pen and pencil sets under the above agreements with K.L. & M.: 5D8S5S3D3SSelling price$1.72 1/2$2.91 1/2$1.72 1/2$1.04$1.35Direct cost.69 1/2.86 1/2.75.25.40Gross profit$1.03$2.05$ .97 1/2$ .79$ .95The gross profit shown in the foregoing tabulation does not take into consideration the following*277 other costs which Starr Pen Company would incur in connection with each unit or each set of the Conklin pens and pen and pencil sets, all of which would reduce the gross profit of Starr Pen Company: The cost of boxes, the cost for labor in placing each unit or each set in a box and the indirect costs for inspection and general overhead. K.L. & M. received its first delivery of merchandise from Starr Pen under the above agreements on April 27, 1943. Deliveries of merchandise were made by Starr Pen to K.L. & M. in large quantities continuously until October 21, 1943, when Starr Pen stopped selling merchandise to K.L. & M. K.L. & M. requested Starr Pen to resume and continue selling mechandise to it but Starr Pen, through the petitioner, took the view that there was no obligation to continue selling merchandise to K.L. & M. Upon the termination of sales by Starr Pen to K.L. & M., the latter had unfilled orders for about $1,000,000 worth of merchandise and owed salesmen commissions for obtaining them. In November 1943, petitioner met with McMahon and King and an arrangement was agreed upon under which K.L. & M. would be able to pay its salesmen the commissions they had earned, and Starr*278 Pen would make deliveries to those who had placed orders. The agreement was carried out. Under the aforesaid agreement, Starr Pen, on November 13, 1943, paid K.L. & M., $22,000, and K.L. & M. assigned the unfilled orders to Starr Pen. On the same day K.L. & M. paid $8,044.20, the balance due on invoices for merchandise received, to Starr Pen. Thereafter, Starr Pen did no business with K.L. & M. excepting the making of deliveries of merchandise to K.L. & M. during October, November, and December, 1943, to replace defective merchandise, or to return defective merchandise which Starr Pen repaired; and K.L. & M. shipped the replacements and repaired merchandise to customers to whom the merchandise was due. During the months of November and December, 1943, Starr Pen partially filled the orders for Conklin fountain pens and K.L. & M. pen and pencil sets which had been assigned to it by K.L. & M. It sold this merchandise to jobbers at the same prices as it had been sold to jobbers by K.L. & M., selling the 5D pen at a price of $2.25 per unit, the 8S pen and pencil set at a price of $3.82 1/2 per set, the 5S pen and pencil set at a price of $2.25 per set, the 3D pen at a price of $1.33*279 per unit, and the 3S pen and pencil set at a price of $1.78 per set. Its sales during these two months totaled approximately $500,000 and its gross profit on such sales was approximately $250,000. Most of these sales were of Conklin fountain pens and fountain pen and pencil sets. Starr Pen Company never filled all the orders assigned to it by K.L. & M. It was unable to do so because of the shortage of fountain pens. United Advertising Co., Inc., was dissolved as of December 31, 1943. A partnership of three partners was formed to succeed the corporation, which did business under the name of O'Neil, Larson and McMahon, at 230 N. Michigan Avenue, Chicago. During the period from April 27, 1943, to January 4, 1944, K.L. & M., through King, made payments of "royalties" in cash, that is to say, cash payments over and above the invoiced charges of Starr Pen and Conklin Pen for merchandise sold and delivered to K.L. & M., in the total amount of $235,198.80. The petitioner and his brother, Samuel Starr, received cash payments from King, from time to time, during the above stated period for Starr Pen Company and its division, Conklin Pen Company, in the total amount of $235,198.80. During*280 the period from April 27, 1943, to November 1943, during which time Starr Pen and Conklin Pen sold and delivered merchandise to K.L. & M., every order of merchandise sold and delivered to K.L. & M. was sold under written invoices of either Starr Pen or Conklin Pen, except 100 gross of combination fountain pen and mechanical pencil type of "pens", known as the "Winchester," which were received by K.L. & M. on November 29, 1943; and K.L. & M. made payments of the amounts shown on the invoices, as the selling prices, by its checks, and the checks were received by Starr Pen and Conklin Pen, excepting the payment for the "Winchester" combination merchandise for which K.L. & M., through King, paid $7,100 in cash (without any invoice) to petitioner. The Starr and Conklin Pen companies sold merchandise to K.L. & M., under invoices, during the above-stated period in the total amount of $338,438.60, plus $7,100 in cash, and petitioner, for Starr Pen Company and its division, Conklin Pen, received "side-payments", or "royalties", in cash, for which no invoices were given on the above total amount of invoiced sales in the total amount of $235,198.80 (exclusive of the above $7,100). The total*281 amounts which accrued to Starr Pen under its invoices to K.L. & M. for the merchandise sold by Starr Pen and Conklin during Starr Pen's accounting periods from February 1, 1943 to June 30, 1943, and from July 1, 1943 to January 31, 1944, are set forth below. The total cash "side-payments", or "royalties", which accrued during the accounting periods of Starr Pen and Conklin Pen from February 1, 1943 to June 30, 1943, and from July 1, 1943 to January 31, 1944, are set forth below: Accrued to Starr Pen & Conklin PenTotalTotal Accrued"Royalties"Per Invoices -Accrued -Acctg. PeriodPd. by CheckPd. by Cash2/1/43-6/30/43$105,111.18$ 66,448.807/1/43-1/31/44233,327.42168,750.00Total$338,438.60$235,198.80The following schedule shows the sales of pens invoiced to K.L. & M. by the Starr Pen Co. between April 27, 1943 and October 15, 1943, and by the Conklin Pen Co. between April 23, 1943 and October 21, 1943: InvoicesAmountfor Monthof InvoicesTotalStarr Pen Co.April$ 960.00May6,440.00June4,985.00July8,595.00August6,890.00September9,010.00October2,650.00Total$39,530.00Conklin Pen Co.April$ 3,209.04May42,475.50June47,041.64July64,868.50August52,415.10September51,162.54October37,736.28Total$298,908.60$338,438.60*282 Upon instructions given her by Henry Junge and King, the bookkeeper of K.L. & M. computed the "side-payments" or "royalties" from the invoices of pens sold and delivered to K.L. & M. by the Starr Pen and Conklin Pen. The computation was made at so much "royalty" per unit invoiced, as follows: SymbolInvoice PriceRoyaltyStarr Pen Co.K.L. & M. 225 X$26.50 per gross$36.00 per grossK.L. & M. 4A or 4N43.00 per gross72.00 per grossConklin Pen Co.#6 (K.L. & M. 5D)1.12 1/2 each.60 each#6S (K.L. & M. 8S)1.91 1/2 each1.00 eachRivet-clipped sets(K.L. & M. 5S)1.12 1/2 each.60 each#10 (K.L. & M. 3D).54 each.50 each#10S (K.L. & M. 3S).75 each.60 eachSome time between the middle of October and the 30th of December, the bookkeeper of K.L. & M. made a schedule of computations showing the "royalties" applicable to each invoice and the total royalties which accrued and were paid to Starr Pen and Conklin Pen during 1943. During the preparation of the schedule, the bookkeeper computed and made pencil notations of "royalties" applicable to the invoices of April, May, June, and July, 1943. The following schedule*283 shows the amount of royalties computed by the bookkeeper as applicable to the invoices of the Starr Pen Co. between April 27, 1943 and October 15, 1943, and the Conklin Pen Co. between April 23, 1943 and October 21, 1943: InvoicesAmountfor Monthof RoyaltyTotalStarr Pen Co.April$ 1,440.00May9,360.00June6,480.00July11,880.00August9,360.00September12,240.00October3,600.00Total$54,360.00Conklin Pen Co.April$ 1,699.20May22,500.00June24,969.60July38,774.40August33,645.60September34,417.20October24,832.80Total$180,838.80$235,198.80The practice which King followed in making the "side-payments" to petitioner was as follows: Checks of K.L. & M. were prepared; they were made payable to cash; they were signed by King and either Larson or McMahon. King cashed the checks at the bank where K.L. & M. had its account. King received currency in large denominations for the amounts of the checks, bills for $1,000 or $500, and sometimes for $100. Thereafter he handed the proceeds of the checks, the currency, to petitioner with a few exceptions, when he handed*284 the proceeds of checks - currency - to petitioner's brother, Samuel Starr. The following schedule shows the dates of the checks of K.L. & M. which were made to cash and cashed by King, and the proceeds of which were handed by King to either petitioner or Samuel Starr; the amounts of the checks, the amounts of "royalties" due at the date of each check on merchandise received by K.L. & M., and the unpaid balances of "royalties" on such dates: Date ofCheck"Royalties"UnpaidCheckNumberAmountDueBalance4-27-431302$ 2,000.00$ 3,139.20$ 1,139.205- 7-4313562,500.003,011.20511.205-14-4313962,500.0010,706.408,206.405-18-4314325,000.0013,966.408,966.405-19-4314595,000.0010,291.205,291.205-21-4314675,000.008,387.203,387.205-26-4315055,000.0011,350.406,350.406- 1-43 115225,000.007,999.202,999.206- 4-4315687,500.0012,690.405,190.406- 9-4315897,500.0012,030.404,530.406-11-4316025,000.008,994.403,994.406-17-43166210,000.0012,980.002,980.007- 2-43 217525,000.008,927.203,927.207- 6-4317685,000.0010,688.005,688.007- 9-43180910,000.0013,032.003,032.007-16-43 318885,000.009,656.004,656.007-23-43192910,000.0016,550.406,550.407-26-4319925,000.0010,668.805,668.807-30-43 420385,000.0015,103.2010,103.208- 3-43204710,000.0014,884.004,884.008- 7-43 5210110,000.0013,171.203,171.208-23-43221510,000.0022,546.4012,546.408-25-43224410,000.0018,328.008,328.009- 1-43229510,100.0018,048.007,948.009- 3-43 6234710,000.0017,173.607,173.609-16-43238110,000.0015,373.205,373.209-22-4324675,000.0012,962.007,962.009-25-43250410,000.0013,146.003,146.009-29-43252110,000.0014,666.004,666.0010-13-43264610,000.0021,370.0011,370.0010-18-43273710,000.0019,779.609,779.6012-30-43 7331413,098.8013,098.80*285 The following schedule sets out the numbers on the checks cashed by King and charged to Starr Pen and Conklin Pen, the amount of each check, and the notations made on the check and the check stub, and the account payable to which each check was charged on the books of K.L. & M.: CheckNotation on leftAcct. PayableNo.AmountCheck Stub Notationside of checkCharged1302$ 2,000.00Mdse. Pur. [pencil]Adv. dep. Starr Co.NoneStarr Pen Co.13562,500.00Mdse. Pur. Starr Pen Co.NoneStarr Pen Co.13962,500.00Conklin Pen Cash PenMdse. Pur, Conklin PenConklin Pen Co.14325,000.00Conklin PurchasesConklin Mdse.Conklin Pen Co.14595,000.00[pencil] Conklin Pen Co.Due Conklin Mdse.Conklin Pen Co.14675,000.00ConklinConklin Mdse.Conklin Pen Co.15055,000.00Conklin Pen Co.Conklin Pen Mdse.Conklin Pen Co.15225,000.00Acc/Pay Conklin Mdse.Conklin Mdse.Conklin PenCo.15687,500.00Conklin Mdse.Conklin Mdse.Conklin Pen Co.15897,500.00Conklin Pen Co. Mdse.Conklin Pen Co.Conklin Pen Co.16025,000.00ConklinConklinConklin Pen Co.166210,000.00Conklin PenConklin Pen Co.Conklin Pen Co.17525,000.00Conklin Mdse.Conklin Mdse.Conklin Pen Co.17685,000.00Conklin PenConklin PenConklin Pen Co.180910,000.00Conklin Pen Co.Conklin Pen Co.Conklin Pen Co.18885,000.00ConklinConklinConklin Pen Co.192910,000.00Conklin Mdse.Conklin Mdse.Conklin Pen Co.19925,000.00ConklinConklin Mdse.Conklin Pen Co.20385,000.00Conklin Mdse.Conklin Mdse.Conklin Pen Co.204710,000.00ConklinConklin Mdse.Conklin Pen Co.210110,000.00Conklin Mdse.Conklin Mdse.Conklin Pen Co.221510,000.00Conklin Mdse.Conklin Mdse.Conklin Pen Co.224410,000.00Conklin Mdse.Conklin Mdse.Conklin Pen Co.229510,000.00Conklin Mdse.Conklin Mdse.Conklin Pen Co.234710,000.00Conklin Mdse.Conklin Mdse.Conklin Pen Co.238110,000.00Conklin Mdse.Conklin Mdse.Conklin Pen Co.24675,000.00(Conklin)Conklin Mdse.Conklin Pen Co.250410,000.00Conklin Mdse.Conklin Mdse.Conklin Pen Co.252110,000.00Conklin Mdse.Conklin Mdse.Conklin Pen Co.264610,000.00Conklin Mdse.Conklin Mdse.Conklin Pen Co.273710,000.00ConklinConklin Mdse.Conklin Pen Co.331413,098.80Conklin Mdse.Balance of Royalties DueConklin Mdse.Conklin Pen Co.Total$235,198.80*286 All notations on the check stubs of checks drawn to "cash," or on the checks, were made either by King or an employee or bookkeeper of K. L. & M. acting under his instructions. The notations were a part of a plan of K. L. & M. to make a record of the cash disbursements that would be acceptable to the Internal Revenue Department as a basis for claims for deduction from the gross income of K. L. & M. of the amounts paid. Credits to Starr Pen Company or Conklin Pen Company were made in the regular course of business on the books of K. L. & M. in connection with the cash paid by King to petitioner or Samuel Starr for merchandise purchased by K. L. & M. from Starr Pen and Conklin. These credits totaled $235,198.80. The credits were entered on the books of K. L. & M. as follows: Book ofAccount PayableDate of EntryOriginal EntryCreditedAmount6-30-43JournalConklin Pen Company$ 16,405.166-30-43JournalStarr Pen Company1,520.006-30-43JournalConklin Pen Company41,188.586-30-43JournalStarr Pen Company2,980.007-31-43JournalConklin Pen Company11,880.00 *7-31-43JournalConklin Pen Company $ 28,015.208- 2-43 to8-31-43Purchase JournalConklin Pen Company35,560.808- 2-43 to8-31-43Purchase JournalConklin Pen Company10,080.00 **9- 9-43 to9-29-43Purchase JournalConklin Pen Company32,214.009- 1-43 to9-28-43Purchase JournalConklin Pen Company11,520.00 **10- 2-43 to10-21-43Purchase JournalConklin Pen Company24,832.8010- 5-43 to10-15-43Purchase JournalConklin Pen Company3,600.00 **12-31-43JournalConklin Pen Company13,098.8012-31-43JournalConklin Pen Company2,397.20 ***$235,292.54Less93.74 ***Total$235,198.80*287 The payments by K. L. & M. of all of the invoices of Starr Pen and Conklin Pen were entered in the books of K. L. & M. The cash payments of K. L. & M. of "royalties", made by King to petitioner or Samuel Starr, were always in even dollar amounts. The computations of the bookkeeper of K. L. & M. of the "royalties" which accrued on the basis of the invoices for merchandise received by K. L. & M. from Starr Pen or Conklin Pen showed odd*288 amounts of dollars and cents. Also, the bookkeeper's computations showed that by October 18, 1943, total cash payments made by King amounted to $222,100, and that as of December 30, 1943, a balance of "royalties" in the amount of $13,098.80 was due Starr Pen. The bookkeeper completed the schedule of "royalties" accrued, paid, and due Starr Pen, or Conklin, at some time before December 30, 1943. The last check made to cash for the payment of "royalties" by K. L. & M. to Starr Pen for $13,098.80 was dated December 30, 1943. The check was drawn on the bank account of K. L. & M. On December 30, 1943, the balance of the bank account of K. L. & M. was not sufficient to cover payment of the check. On January 3, 1944, Norman Cooper, an employee of K. L. & M. went to the bank and cased the check made payable to "cash" for $13,098.80; he gave the cash proceeds to King at the office of K. L. & M. King could not reach petitioner on January 3, 1944, and, therefore, the currency in the above amount was delivered to McMahon at the office of O'Neil, Larson, and McMahon, where it was kept in the office vault. On January 4, 1944, King handed the currency in the amount of $13,098.80 to petitioner at*289 petitioner's office. McMahon accompanied King in a taxicab to petitioner's office and waited in the taxicab while King went to petitioner's office with the currency. As above stated, King made some cash payments of "royalties" to Samuel Starr. Those amounts and the dates of those payments were as follows: April 27, 1943$2,000May 7, 19432,500May 14, 19432,500May 18, 19435,000The amounts of cash payments of "royalties" which King handed to petitioner, and the dates on which King delivered currency to petitioner were as follows: May 19, 1943$ 5,000.00May 21, 19435,000.00May 26, 19435,000.00May 28, 19435,000.00June 4, 19437,500.00June 9, 19437,500.00June 11, 19435,000.00June 17, 194310,000.00July 1, 19435,000.00July 6, 1943$ 5,000.00July 9, 194310,000.00July 17, 19435,000.00July 23, 194310,000.00July 26, 19435,000.00July 31, 19435,000.00Aug. 3, 194310,000.00Aug. 10, 194310,000.00Aug. 23, 194310,000.000Aug. 25, 194310,000.00Sept. 1, 194310,100.00Sept. 4, 194310,000.00Sept. 16, 194310,000.00Sept. 22, 19435,000.00Sept. 25, 194310,000.00Sept. 29, 194310,000.00Oct. 13, 194310,000.00Oct. 18, 194310,000.00Jan. 4, 194413,098.80*290 Early in October, 1943, petitioner agreed that Starr Pen Company would sell 100 gross of combination fountain pens and mechanical pencils bearing the name "Winchester" to K. L. & M. at an invoice price of $36 per gross, which was to be paid by check, plus an additional amount of $35 per gross which was to be paid with cash, or at a total price of $71 per gross. This merchandise could not be delivered immediately. A short time later, Starr Pen delivered to K. L. & M. several samples of the combination fountain pen and mechanical pencil. K. L. & M. obtained orders. On about November 15, 1943, petitioner advised King that Starr Pen was ready to ship the 100 gross combination pens and pencils. He told King to bring $7,100 in cash to Starr Pen's office in payment for this merchandise. On November 29, 1943, King had an employee of K. L. & M. prepare a check for $7,100. The bookkeeper of K. L. & M. made the following notation on the check: "Winchester merchandise." This check was cashed at the bank by Cooper. Cooper handled the proceeds of the check to King at the office of K. L. & M. On November 29, 1943, King delivered $7,100 in currency to petitioner in the office of Starr Pen. On the*291 same day, Starr Pen delivered 100 gross of the combination pens and pencils to K. L. & M. Starr Pen never sent K. L. & M. an invoice for this merchandise. All the checks of K. L. & M. in payment for the invoices received from Starr Pen or Conklin Pen for merchandise were either handed to the messenger of Starr Pen at the time he delivered merchandise to the offices of K. L. & M., or they were mailed to Starr Pen Company. Under the arrangement between petitioner and King, Starr Pen extended credit to K. L. & M. on the first four shipments of the Conklin fountain pens or pen and pencil sets, or of the 225X pens, or of the 4A and 4N pen and pencil sets. Thereafter, as shipments of merchandise were received by K. L. & M., the latter was to deliver checks to the messenger of Starr Pen in payment of one or more previous shipments. King told petitioner that K. L. & M. did not have sufficient capital to pay for each shipment as soon as it was received. On some of the occasions when shipments were received, it was not possible to obtain the signature of King or the co-signature of either Larson or McMahon on the check of K. L. & M. On such occasions, King or an employee of K. L. & M. customarily*292 telephoned petitioner and arranged with him to authorize the messenger to leave the shipment at the office of K. L. & M. even though no check was ready, and, thereafter, the check of K. L. & M. would be mailed to Starr Pen Company. In the latter part of April, 1943, McMahon consulted an attorney for United Advertising Company, Henry Junge, about a general problem involving the keeping of records of payments of cash for merchandise received without invoices. As a result of McMahon's inquiry, Junge made inquiries of attorneys and others in the Bureau of Internal Revenue offices in Chicago about the type of records a taxpayer must keep to prove payments of cash for merchandise received without invoices. At the time Junge made the inquiries, he understood that his clients were not making payments for merchandise in excess of maximum O.P.A. prices. Junge was advised about what type of records of cash payments should be kept. He was also told by the persons he interviewed in the Bureau of Internal Revenue offices in Chicago that a taxpayer had the burden of proving the amounts of cash spent for merchandise; that payments of O.P.A. ceiling prices constituted legitimate expense, but that*293 it was, at that time, the view of the Bureau of Internal Revenue that it could not allow deductions for payments of amounts above O.P.A. ceiling prices. Junge sent two letters to McMahon, one in April, and one in May of 1943, advising him of the information he had obtained through his inquiries. In one of the letters, he pointed out that the payment of overceiling O.P.A. prices was illegal and that deductions of such payments would not be allowed. Junge gave instructions to McMahon and Lilian Reid, the bookkeeper of K. L. & M., about keeping records of cash payments made without invoices. Junge also instructed his client to get from those from whom merchandise was purchased, the seller's price structure. K. L. & M. did not "like" Junge's instructions about O.P.A. regulations and it hired another attorney to advise about O.P.A. matters. At the end of July or the first part of August, Junge went to the offices of K. L. & M. to instruct the bookkeeper, Lilian Reid, about the keeping of records of cash purchases of merchandise. Junge's instructions were that on every occasion when King wanted cash to pay for merchandise without an invoice, Lilian Reid should prepare a check for the*294 cash and write on the check, or on the check stub, what the cash was for, fastening a memorandum to each check setting forth the details of the transaction as to the purchase made, the date the check was cashed, and under what circumstances the cash was given to King or to anyone else. Junge also instructed Miss Reid to make notation, on invoices which did not reflect actual payments made, about any "overage" which was being paid for merchandise covered by the invoice. He also instructed that other papers, such as receipts of the shipping clerk and cancelled checks should be kept together with papers relating to separate transactions so that each transaction would be self-explanatory. Junge, at some later time, found that his instructions were not being fully carried out by Miss Reid, and he gave her further instructions about keeping records. Also, he advised K. L. & M. to hire an auditor to review the books of K. L. & M. to get them to truly reflect all transactions, and he hired an auditor. One reason he hired an auditor was to have the books of K. L. & M. brought up to date with respect to all of its business transactions. Junge found that many invoices, about 1,000, had not*295 been entered on the books of K. L. & M., including some of Starr Pen Company and Conklin Pen Company. Junge also instructed Miss Reid to find out once and for all about whether "royalties" were being paid on merchandise and to be more specific about making memoranda about transactions. Junge's purpose in giving instructions about keeping records was so that K. L. & M. could substantiate and establish payments for which it might claim deductions. Junge also instructed Miss Reid that if she made pencil notations on invoices, she should make them on a place on an invoice so that it would be clear that the notation had not been made by the party who sent the invoice, i.e., the seller. On about July 15, 1943, Junge learned that Miss Reid was making calculations of royalty payments. Junge was advised by Miss Reid, King, Mrs. Risk (an auditor), Larson, Cooper, and an unnamed bookkeeper about the rates at which royalties were being computed. On one occasion, as is set forth hereinafter, Junge was with McMahon having lunch at Mann's Restaurant in Chicago.he saw King and petitioner having lunch together, seated at another table. He observed an incident between King and Starr. He reported*296 it to the Government at some undisclosed time. King's partners were aware of his cashing of checks made payable to cash, and of his payments of cash to petitioner and Samuel Starr. At various times either McMahon, Larson, or someone else accompanied King to the bank where the partnership kept its bank account, witnessed King's receipt of currency for a check of K. L. & M., and accompanied King when he went to an office or a restaurant with the currency. The following are examples: On April 27, 1943, McMahon accompanied King to the bank; King cashed a check for $2,000; McMahon accompanied King to the office of Samuel Starr, where he waited in the corridor. King went into Samuel Starr's office with the currency received at the bank. On June 9, 1943, McMahon went with King to the bank where King, in McMahon's presence, cashed a check for $7,500 and placed the currency in an envelope. King and McMahon went to petitioner's office in a taxicab. Since McMahon wanted to see the cash delivered to petitioner, King removed the currency from the envelope while they were in the taxicab. King delivered the currency to petitioner at the entrance to petitioner's private office. At that time, *297 McMahon was about nine feet from the petitioner and King, and he witnessed the transaction. On June 17, 1943, King cashed a check of K. L. & M. for $10,000. He went to Mann's Restaurant where he was joined by petitioner. Larson and some associates sat at a table in the restaurant near King's table. Larson sat facing King. Larson saw King hand an envelope to petitioner. On July 23, 1943, King cashed a check of K.L. & M. for $10,000 and put the currency in an envelope. By prior agreement, McMahon and Junge went to Mann's Restaurant for lunch. Petitioner had lunch with King. McMahon and Junge saw King hand petitioner and envelope. On August 3, 1943, King and Larson went to the bank. King cashed a check for $10,000. Larson accompanied King in a taxicab to the offices of Starr Pen Company. Larson waited in the lobby for King. King went into the offices with the currency he had obtained at the bank. On August 10, 1943, McMahon accompanied King to the bank where King cashed a check for $10,000. King put the currency in an envelope. King and McMahon went to Mann's Restaurant. King and McMahon at first sat at separate tables. Petitioner joined King at his table. McMahon saw King hand*298 petitioner the envelope in which King had placed the currency which he received at the bank, after which Larson went to King's table and had lunch with King and petitioner. Junge employed a detective, W. C. Dannenberg, in August, 1943. The purpose of the employment was as follows: Dannenberg was to meet King at a bank at some agreed time and was to observe what King did at the bank and thereafter. Accordingly, on August 23, 1943, Dannenberg met King at a bank and King showed Dannenberg a check for $10,000. Dannenberg then observed the following: He saw a bank teller exchange currency for the check and put the currency in an envelope. He saw the bank teller give the envelope containing the currency to King. He saw King put the same envelope in his shirt pocket and button the fold of the pocket. Thereupon Dannenberg joined King in a taxicab and they went together to a place near Mann's Restaurant. Upon leaving the taxicab, King went ahead of Dannenberg into Mann's Restaurant. Dannenberg followed him into the restaurant and sat at a table facing King. In the restaurant, Dannenberg observed the following: King sat at a table. A man joined King at King's table. King took out of his shirt*299 pocket the envelope which he had received from the bank teller and gave it to the man seated at his table who put the envelope in his right-hand hip pocket. King and his companion had lunch and left the restaurant. They parted outside the restaurant. Dannenberg reported his observations to Junge. At the trial of this case, Dannenberg identified the man to whom King had given the envelope containing currency, as above described, on August 23, 1943, to be Joseph Starr. In September 1943, King, in the offices of K.L. & M. asked petitioner for an invoice from Starr Pen Company to K.L. & M. setting forth the cash payments which King had been paying to petitioner for K.L. & M. Petitioner did not agree to give K.L. & M. the invoice. In October, 1943, King, who was then in his office at K.L. & M., telephoned petitioner and said to petitioner that his attorney (K.L. & M.'s) demanded that petitioner furnish invoices for the cash payments King had been making to petitioner and for the cash payments King would make to petitioner. Petitioner said that he would come to King's office with an auditor. Junge listened to this conversation on an extension telephone. Before October 18, 1943, King*300 instructed Miss Reid, in anticipation of petitioner's examination of the books of K.L. & M., to have pencil notations of amounts of "royalties" erased from invoices of Starr and Conklin Pen; to remove from the cash disbursements journal the regular pages which showed cash payments to Starr and Conklin Pen; and to write substitute pages in which cash payments to Starr and Conklin Pen would be omitted and to put the substitute pages in the book. This was done by Miss Reid and her assistant on October 18, 1943. Ungar participated. In the writing of the new journal pages credits (but not debits) showing cash payments were eliminated, but the columnar footings (totals) were not changed to correspond to the omissions; they were the same as those on the pages which had been removed. During the evening of October 18, 1943, petitioner and his accountant, Cohn, arrived at the offices of K.L. & M. King and Cooper were at the office; Cooper was in the shipping room. Cohn examined the cash disbursements journal. Cohn, using an adding machine, added the figures in the credit columns on a number of the pages and found that the adding machine totals did not agree with the totals appearing on the*301 journal pages. Cohn asked King for an explanation. King told Cohn that the difference in the totals represented the cash which King had been paying to Starr. At some time after October 18, 1943, the bookkeeper of K.L. & M. replaced the original pages in the cash disbursements journal and she destroyed the substitute pages which she had prepared on October 18th. She acted in compliance with King's instructions. After Starr Pen Company stopped selling merchandise to K.L. & M., which was on October 31, 1943, King and McMahon, in the offices of Starr Pen Company discussed with petitioner matters relating to the unfilled orders of customers of K.L. & M. to purchase about one million dollars worth of Conklin pens and pen sets. In the course of the discussion, McMahon said to petitioner, "We have paid you well over $200,000 in cash alone." At this meeting McMahon asked petitioner to give K.L. & M. an invoice. During the time from January 1, 1943 to January 4, 1944, petitioner was in Chicago, Illinois, or New York, New York, during the periods indicated below: Chicago, IllinoisJanuary 1, 1943 to March 31, 1943New York, New YorkApril 1, 1943 to April 7, 1943Chicago, IllinoisApril 8, 1943 to April 28, 1943New York, New YorkApril 29, 1943 to May 8, 1943Chicago, IllinoisMay 9, 1943 to July 26, 1943New York, New YorkJuly 27, 1943 to July 29, 1943Chicago, IllinoisJuly 30, 1943 to August 19, 1943New York, New YorkAugust 20, 1943Chicago, IllinoisAugust 21, 1943 to December 27, 1943New York, New YorkDecember 28, 1943 to December 30, 1943Chicago, IllinoisDecember 31, 1943 to January 4, 1944*302 During the period between January 1, 1943 and January 4, 1944, petitioner entered his safe deposit box at the City National Safe Deposit Company, 208 S. LaSalle Street, Chicago, Illinois, on the dates and at the times indicated below: March 24, 194312:30 P.M.March 2511:20 A.M.March 2911:40 A.M.May 112:50 P.M.May 213:50 P.M.May 2510:20 A.M.May 272:10 P.M.June 42:00 P.M.June 92:20 P.M.June 1211:30 A.M.June 172:30 P.M.June 3012:50 P.M.July 311:40 A.M.July 712:30 P.M.July 92:50 P.M.July 1312:40 P.M.July 131:10 P.M.July 1912:40 P.M.July 2410:20 A.M.August 211:50 A.M.August 31:50 P.M.August 1211:50 A.M.August 2410:30 A.M.September 22:00 P.M.September 71:50 P.M.September 163:50 P.M.September 1810:20 A.M.September 2710:40 A.M.September 293:20 P.M.October 18, 19432:30 P.M.October 282:20 P.M.November 101:20 P.M.November 161:30 P.M.November 171:50 P.M.December 812:30 P.M.December 103:10 P.M.December 1111:30 A.M.December 1312:00 NoonDecember 189:40 A.M.December 2711:10 A.M.January 4, 19442:10 P.M.During 1943, K.L. *303 & M. also purchased large quantities of fountain pens and pen points from four companies other than Starr Pen Company. Three of these sellers were located in the State of New York; the fourth was located in Virginia. In 1943, these companies followed two practices with respect to invocies in selling merchandise to K.L. & M. In some instances, these companies sent invoices to K.L. & M. for shipments of merchandise and K.L. & M. paid the invoices by check. In other instances, these companies did not send invoices to K.L. & M. for shipments, and K.L. & M. made payments by cash. For such cash payments, a check was drawn payable to cash, and King, or an employee of K.L. & M., cashed the check. An employee of K.L. & M. sent the cash proceeds of the check by registered mail to the seller. In some instances, cash was sent by registered mail to a representative of K.L. & M. who delivered the cash to the seller. In a few instances, King personally delivered cash to such vendors of merchandise. K.L. & M., acting under instructions from Junge, kept the following records of such cash payments for merchandise; the cancelled check, the postal receipt signed by the person who received the registered*304 letter containing the cash payment, a copy of the receipt from the express company which had delivered a shipment to K.L. & M., the receiving ticket of K.L. & M. for the shipment, and a memorandum prepared by the K.L. & M. bookeeper at the time of the transaction, setting forth the date, number and amount of the check in order to make payment for a shipment, the company to which the cash proceeds of the check had been sent, and the quantity, type, and cost of the merchandise received by K.L. & M. The postal receipt, express receipt, receiving ticket, and the memorandum relating to a shipment were kept clipped together. K.L. & M. also retained all correspondence with the company relating to a cash payment by K.L. & M. During 1943, K.L. & M. delivered cash in the aforementioned manner to one or more of these four companies in such amounts as $2,000, $2,500, $5,000, $7,500 and $10,000 in payment for merchandise received by K.L. & M. without invoices. During 1943, K.L. & M. delivered over $300,000 in cash in the aforementioned manner to these four companies and to others for shipments of merchandise received by K.L. & M. without invoices. O.P.A. filed a complaint against petitioner*305 and other partners of Starr Pen Company and Conklin Pen on August 3, 1944, in the U.S. District Court for the Northern District of Illinois in which O.P.A. made charges that the defendants had sold fountain pens and pencil sets at prices in excess of the maximum prices established by the Maximum Price Regulation, No. 188, as amended, and that the defendants had evaded the regulation by use of the device of invoicing merchandise at the maximum prices and collecting, in addition, as "side-payments," further sums of money. The defendants were charged with receiving $248,536.22 of "side-payments," and the complaint asked for treble damages of $748,608.66. The defendants filed a motion to dismiss the complaint alleging that Maximum Price Regulation No. 188 did not apply to them because they were not manufacturers, and for other reasons. The O.P.A. filed an amended complaint. It was dismissed on December 11, 1944. Thereafter, O.P.A. filed other amended complaints. The proceeding never came to trial. It was dismissed on May 13, 1948, upon motion of the Government after Jack Starr paid the Government $1,000. On January 11, 1946, the United States Emergency Court of Appeals in Conklin Pen Co. v. Bowles, 152 Fed. (2d) 764,*306 held that the O.P.A. Maximum Price Regulation No. 188 never applied, when properly interpreted, to manufacturers of fountain pens and mechanical pencils, and that O.P.A. Order No. 1617 fixing the maximum prices of Conklin Pen was invalid. In August, 1943, petitioner and his brother, Samuel Starr, had discussions with the president of Paramount Pen Company of North Bergen, New Jersey, relating to the purchase of the assets of Paramount. In these discussions the total purchase price of Paramount was to be in the neighborhood of $275,000. Paramount gave Starr Pen Company an option on August 20, 1943 which was to end on January 31, 1944. Starr Pen Company paid $1,000 for the option. Petitioner drew checks on the account of Starr Pen Company, thereafter, to set aside funds for the purchase, charging withdrawals to the partners. The sums of $59,000 and $25,000 were drawn against the drawing accounts of Samuel and Jack, respectively. Samuel and Jack endorsed checks totaling the above amounts drawn against their drawing accounts and petitioner received the proceeds and placed them in his safe deposit box. Starr Pen Company did not exercise the option to purchase Paramount. Nevertheless, *307 petitioner did not return to Samuel or Jack any part of the above sums. On May 26, 1944, Samuel filed a complaint in equity in the Circuit Court of Cook County against petitioner seeking dissolution of Starr Pen Company and an accounting, in which Samuel alleged the facts about the negotiations to purchase Paramount, and about the delivery to petitioner of various checks totaling $59,000 and $25,000. Petitioner filed his sworn answer to the complaint and in his answer he denied that he had received $59,000 from Samuel Starr. At the time he read and swore to the answer containing the above denial, the $59,000 was in his safe deposit box. His denial of the receipt of $59,000 was a falsehood. The income tax return of the partnership, K.L. & M., for 1943 reported the following: Gross receipts from business$1,674,852.96Cost of merchandise sold1,320,016.18Gross profit$ 354,836.78 The sum of $1,320,016.18, cost of merchandise sold, includes amounts paid to several concerns which sold merchandise to K.L. & M. during 1943, including Starr Pen Company, and it includes the cash payments paid to Starr Pen during 1943 in the total amount of at least $235,198.80. *308 The income tax liability of K.L. & M. for 1943 is still open, waivers having been executed by K.L. & M. extending the statutory period within which the Commissioner can make determination of any deficiency in the tax liability of K.L. & M. for 1943. During 1943, Samuel Starr received for the partnership Starr Pen Company from K.L. & M. cash payments for merchandise in the total amount of $12,000; and Joseph Starr received for Starr Pen Company from K.L. & M. cash payments for merchandise in the total amount of $223,198.80. The above cash payments in the total amount of $235,198.80 represented "overage" payments which were in addition to the invoiced prices of merchandise sold in 1943 by Starr Pen and Conklin Pen to K.L. & M. Of the total cash "overage" payments received by Starr Pen Company from K.L. & M., $66,448.80 accrued to Starr Pen on the basis of its invoices for merchandise sold to K.L. & M. during Starr Pen's accounting period February 1, 1943 to June 30, 1943; and $168,750 accrued to Starr Pen on the basis of its invoices to K.L. & M., during Starr Pen's accounting period July 1, 1943 to January 31, 1944. On November 29, 1943, petitioner received in cash for Starr Pen*309 Company $7,100 for 100 gross "Winchester" pen and pencil combinations sold to K.L. & M. There accrued to Starr Pen Company during its fiscal period ended January 31, 1944, for "overage" on merchandise sold to K.L. & M. $168,750, plus $7,100 for "Winchester" merchandise, a total of $175,850, which was paid in cash to petitioner for Starr Pen Company. The petitioner's distributable share for the calendar year 1943 of the adjusted net income after salaries of Starr Pen Company, increased to include in its income for the period ended June 30, 1943 the accrued cash receipts of $66,448.80, amounted to $46,514.60. The petitioner failed to include $46,514.60 in his individual income for 1943. The petitioner's distributable share for the calendar year 1944 of the adjusted net income after salaries of Starr Pen Company, increased to include in its income for the period ended January 31, 1944 the accrued cash receipts of $175,850, amounted to $123,095. The petitioner failed to include $123,095 in his individual income for 1944. Part of the deficiency for each year, 1943 and 1944, is due to fraud with intent to evade tax. Opinion Under section 182 of the Code, the petitioner is taxable*310 upon his distributive share of the ordinary net income of the Starr Pen Company partnership whether or not distribution was made to him. The Commissioner has determined that for the calendar years 1943 and 1944, the petitioner understated his distributive share of the partnership's ordinary income to the extent of $46,514.60 and $123,095, respectively. That determination is based upon the underlying determination of the Commissioner that in 1943 and 1944, K.L. & M. paid Starr Pen Company through petitioner and Samuel Starr, in cash, the total amount of $242,298.80 for merchandise, which accrued to Starr Pen Company in its accounting two periods ended June 30, 1943 and January 31, 1944, in the amounts of $66,448.80 and $175,850, respectively. The petitioner has the burden of proving that the Commissioner's determination that he is taxable in 1943 and 1944 upon income of $46,514.60 and $123,095 is invalid. Whether or not petitioner is taxable on the above amounts depends upon whether the disputed cash payments were made to Starr Pen Company through petitioner and his brother, Samuel. Therefore, petitioner's burden of proof encompasses the question of whether the disputed cash payments*311 accrued and were paid to his partnership. Since the respondent, in his amended answer, made the claim that the cash payment of $7,100 was made to petitioner for "Winchester" merchandise sold by his partnership, the respondent has the burden of proof with respect to this alleged transaction, and petitioner's burden of proof relates to the other alleged cash payments of $235,198.80. The respondent has the burden of proving whether any part of the deficiency for each year 1943 and 1944 was due to fraud with intent to evade tax. The record in this proceeding is very large; it includes testimony covering 2,974 pages of transcript. The entire record has been considered and carefully analyzed by the Court. The petitioner denies that he ever received, directly or indirectly, himself or through his brother Samuel or anyone else, any of the alleged cash payments; and that Starr Pen Company and its division, Conklin Pen Company ever received, directly or indirectly, any of the cash payments. He denies that Starr Pen Company, in November 1943, sold 100 gross "Winchester" pen and pencil combinations to K.L. & M. He contends that Starr Pen Company received only, and not more than, the amounts*312 stated in invoices to K.L. & M. for merchandise sold in 1943. He takes the position that all of King's testimony about price arrangements and payments of "royalties", or "overage", in cash to him and to Samuel Starr is pure fiction, created by King. Petitioner relies, almost entirely upon the records of Starr Pen Company. He relies upon his own testimony, and that of three witnesses, Cohn, the Starr Pen Company's accountant; Ungar, a former sales manager of K.L. & M.; and Herron, a former salesman of K.L. & M. The petitioner, on brief, has argued, in effect, that he is the innocent victim of a hoax, or a scheme, and that the testimony of King is improbable, incredible, and unworthy of belief. His argument strongly suggests, also, that he would have us believe that he is the object of what would amount to a conspiracy of persons who seek to obtain for their business partnership, K.L. & M., the benefits of income tax deductions for the alleged cash payments of alleged "royalties" of $235,198.80, plus $7,100. He points out that the income tax liability of the members of the K.L. & M. partnership is still open (waivers extending limitations having been executed) and pending before the*313 Commissioner of Internal Revenue, and that in the partnership return of K.L. & M. for 1943, there was included in the cost of the merchandise purchased by K.L. & M. in 1943, the sum of the alleged "royalty" payments, $235,198.80, for which K.L. & M. seeks a tax deduction. Petitioner does not raise any question about the amounts of his distributive shares of the net income of Starr Pen Company for 1943 and 1944. Therefore, if the disputed income accrued to his partnership in the fiscal periods here involved, petitioner is taxable under section 182 of the Code, upon the amounts which the respondent has determined. Cf. Jack M. Chesbro, 21 T.C. 123 (promulgated October 28, 1953). In this matter, petitioner's burden of proof also encompasses proof about distributions of partnership income to him as well as about the amounts of the net partnership income constituting his distributive shares. The rule as to the burden of proof upon the petitioner is generally stated to be that the taxpayer having the burden of proof must prove his facts by a "preponderance of evidence", and by "competent evidence." Thompson Pottery Co. v. Routzahn, 25 Fed. (2d) 897; S. W. Pike Seedsman, Inc., 42 B.T.A. 751.*314 Credible evidence must be presented. W. M. Buchanan, 20 B.T.A. 210. The Commissioner's determination is prima facie correct. Of course, that presumption does not amount to substantive evidence. Estate of Edwin F. Gillette v. Commissioner, 182 Fed. (2d) 1010; Gazette Publishing Co. v. Self, 103 Fed. Supp. 779, 783; Woodward v. United States, 106 Fed. Supp. 14. And if a taxpayer meets his burden of proving that the Commissioner's determination about his tax liability is excessive, Helvering v. Taylor, 293 U.S. 507, he is not required to prove in addition that he owes no tax or the correct amount of the tax he owes. The Federal National Bank of Shawnee, Okla. v. Commissioner, 180 Fed. (2d) 494, 497. The petitioner did not introduce any evidence about the general conduct of the business of Starr Pen Company with others besides K.L. & M. His burden of proof involves the proving of negatives. It is conceivable that in attempting to meet such difficult burden of proof, he could place some reliance upon proof of the income of the partnership and of himself by use of the increase in net-worth or bank-deposit*315 methods, just as, in some instances, the Commissioner resorts to such methods to establish the amount of income. But petitioner did not introduce such evidence. The petitioner did not produce the testimony of any of his partners or former partners in Starr Pen Company, such as Samuel Starr, William Starr, and Jack Starr. He relied primarily upon his own testimony. His witnesses Cohn, Ungar, and Herron were called, chiefly to either corroborate some of his testimony, or to impeach the testimony of King and of others. Their testimony is not impressive. The testimony of the respondent's witnesses, particularly that of King, is in direct conflict with petitioner's denials that he and Samuel Starr received cash payments in 1943 and 1944 for Starr Pen and Conklin Pen merchandise. In this situation we must analyze, scrutinize, and weigh all of the evidence to determine what is credible, and what inferences are to be drawn therefrom, and we must take into account contradictions and inconsistencies in the testimony of witnesses. We have done all of these things and we come to the conclusion that petitioner and his witnesses have failed to impeach or discredit the testimony of either King*316 or other witnesses of the respondent. That conclusion narrows our considerations to the probative value of petitioner's testimony. Absent from the record is testimony of Samuel Starr with respect to cash payments which King has testified were made to Samuel, and of William Starr with respect to a sale of "Winchester" merchandise. Petitioner's failure to produce the testimony of these persons leads to a presumption that, if called, each would have given testimony adverse to petitioner. Mammoth Oil Co. v. United States, 275 U.S. 13. The petitioner's credibility is now not free from doubt. Respondent has introduced evidence of an instance where petitioner, in a sworn answer to a suit against himself, gave a false statement, and petitioner now admits that the statement was false. The incident is set forth in the findings of fact. See Richard Law, 2 T.C. 623, 628. Transactions of the type here involved, the alleged delivery of money by one person to another, are necessarily secret and in many instances of this type, the true situation is known only to the immediate parties. We are not compelled to blindly accept testimony that there was or was not an understanding*317 between petitioner and King about prices of merchandise, stock numbers, and "royalties" or "sidepayments." We may examine the probabilities of the truth of testimony as revealed by the entire record. Rand et al. v. Helvering, 77 Fed. (2d) 450, 451; Hoefle v. Commissioner, 114 Fed. (2d) 713; Birnbaum v. Commissioner, 117 Fed. (2d) 395. In this case, there is voluminous testimony of witnesses called by the respondent which corroborates King's testimony. On some occasions, there was a witness to the act of King's handling currency, or of envelopes said to contain currency, to petitioner. This evidence, and that of King, is positive. Cf. Richard Law, supra.King's testimony about an understanding with petitioner about "side-payments" in cash is supported by that of Larson, McMahon, Junge, Dannenberg, Cooper, and Reid. On the side of K.L. & M. and of King, the arrangements and King's conduct were not secret or secretive. The partners of K.L. & M. set out to keep records and establish proof of payments in cash at the time of the payments of cash to Joseph and Samuel Starr. K.L. & M. was buying merchandise for cash from several concerns*318 in 1943, and its attorney, Junge, was consulted, and he gave advice about the kind of proof required to establish that cash payments for merchandise were being made to all payees. Junge's instructions about keeping records were followed, not expertly but adequately, in our opinion; and he demonstrated a certain amount of vigilance in seeing that his instructions and advice were followed by employees of K.L. & M. The books of K.L. & M. were produced showing entries of checks made payable to cash for cash payments; cancelled checks and check stubs were produced in evidence; lengthy testimony of the bookkeeper of K.L. & M. was produced which related to her keeping of accounting records and her computations of the amounts of cash "royalties" on purchases from Starr Pen and Conklin Pen. She computed "royalties" totaling $235,198.80. Accordingly, there is a substantial amount of corroboration of King's testimony that he paid, in cash, "royalties" totaling $235,198.80 to Joseph and Samuel Starr, and that he paid cash of $7,100 for "Winchester" merchandise to Joseph Starr. There is circumstantial evidence, upon which respondent relies, which supports the testimony of King about an understanding*319 with petitioner and the cash payments which he testified he made to petitioner, as follows: Petitioner admits that from time to time he had lunch with King at Mann's restaurant. There is testimony that in September and early October of 1943, King, on behalf of K.L. & M., asked the petitioner for an invoice which would set forth the amounts of the cash payments which had been made by K.L. & M. in addition to the payments of invoices. Shortly after this request, petitioner and the accountant for his partnership, Cohn, examined some of the books (but not all) of K.L. & M. In the cash disbursements journal which was examined by Cohn, there were new, substitute pages which had been prepared in the office of K.L. & M. in anticipation of the visit of petitioner and Cohn which were not the original pages which were kept in the regular course of business. The substitute pages had been prepared for the purpose of the examination by petitioner and Cohn. Cohn observed that the figures at the bottom of each page, representing the totals of the figures in the columns, were not the actual total amounts of the figures in the columns. He inquired about the discrepancies and was told by King that*320 the difference represented the cash payments which were not entered on the lines and in the columns of the accounting pages. Immediately thereafter the Starr Pen Company stopped selling merchandise to K.L. & M. The respondent argues that this is circumstantial evidence of petitioner's concern about detection of the cash payments. The respondent relies upon another set of circumstances, namely, the close coincidence of the dates and hours of petitioner's entries to his safe deposit box with the dates of the alleged payments of cash to petitioner by King. The petitioner's explanations about visits to the box do not overcome the inference suggested by the close proximity of the dates and time of his visits to the dates on which King has testified he gave cash to petitioner. The following schedule prepared by the respondent, based upon the record, illustrates the respondent's point: Date ofAmount ofDate ofTime ofPaymentPaymentEntryEntry4-27-43$ 2,000.005- 7-432,500.005-11-432:50 P.M.5-14-432,500.005-18-435,000.005-19-435,000.005-21-435,000.005-21-433:50 P.M.5-26-435,000.005-27-432:10 P.M.5-28-435,000.006- 4-437,500.006- 4-432:00 P.M.6- 9-437,500.006- 9-432:20 P.M.6-11-435,000.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:30 A.M.6-17-4310,000.006-17-432:30 P.M.7- 1-435,000.007- 3-4311:40 A.M.7- 6-435,000.007- 7-4312:30 P.M.7- 9-4310,000.007- 9-432:50 P.M.7-17-435,000.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:40 P.M.7-23-4310,000.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:20 A.M.7-26-435,000.007-31-435,000.008- 2-4311:50 A.M.8- 3-4310,000.008- 3-431:50 P.M.8-10-4310,000.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:50 A.M.8-23-4310,000.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:30 A.M.8-25-4310,000.009- 1-4310,100.009- 2-432:00 P.M.9- 4-4310,000.009- 7-431:50 P.M.9-16-4310,000.009-16-433:50 P.M.9-22-435,000.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,000.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:40 A.M.9-29-4310,000.009-29-433:20 P.M.10-13-4310,000.0010-18-4310,000.0010-18-432:30 P.M.1- 4-4413,098.801- 4-442:10 P.M.$235,198.80*321 Respondent contends that the evidence relating to the alleged prices at which Starr Pen Company sold merchandise to K.L. & M., including the alleged cash, or "side-payments," and the evidence relating to alleged resale prices at which K.L. & M. sold the merchandise, is more convincing on the point of the profit which K.L. & M. and Starr Pen Company, respectively, realized from the merchandise involved, than petitioner's assertions are when followed through to a computation of the low profit Starr Pen must have made, if it did not receive the "side-payments." We need not elaborate upon this complicated comparison of computations, but make note of it because it has been considered and there is merit in the contention. Petitioner argues that there is one event which weighs in his favor, namely, the dismissal of the suit of O.P.A. for treble damages against himself and other partners in Starr Pen Company. However, this circumstance is not necessarily favorable to petitioner. First, it must be pointed out that the record in this proceeding does not show anything about the reasons for the dismissal upon a motion of the Government. We do not know why the Government dropped that suit. *322 But there is a reference in the record in this case to another case appealed by Conklin Pen Company, a division of Starr Pen Company, namely, Conklin Pen Co. v. Bowles, 152 Fed. (2d) 764 (about which there is no mention in petitioner's brief), in which it was held that the O.P.A. Order, No. 1617, fixing the maximum prices of merchandise of Conklin Pen, was invalid. That decision was entered on January 11, 1946, while the other O.P.A. suit against the partners of Starr Pen for treble damages was pending, and it must be weighed against the inference which petitioner seeks to have us adopt to the effect that the O.P.A. suit for treble damages was dropped in 1948 for some reason relating to a reluctance of the Government to prosecute the suit for treble damages. In view of the decision in Conklin Pen Co. v. Bowles, supra, there is considerable doubt whether, as a matter of law, the O.P.A. Maximum Price Regulations applied to Starr Pen or Conklin Pen. In this case, there is no evidence establishing that Starr Pen or Conklin Pen were subject to the restrictions of the Emergency Price Control Act of January 30, 1942, although, in 1943, it is possible that the partners*323 of Starr Pen and of K.L. & M. believed O.P.A. ceiling prices applied to Starr Pen. If the Emergency Price Control Act did not apply to Starr Pen Company, that may have been the reason for the Government's abandonment of the O.P.A. suit for treble damages. In considering every detail of the voluminous record of this case, care has been exercised to evaluate the inconsistencies in some of the details of the testimony of respondent's witnesses. Attention has been given to testimony about King's expenditures for luxuries such as jewelry and furs, and to testimony about his gambling activities, and about his displays of currency in large denominations. However, in considering the complete and entire record, we are unable to conclude that King's testimony is unworthy of belief. As a general rule positive and uncontradicted testimony as to the particular fact may not be disregarded and should turn the scales. That rule admits of many exceptions. Greenfeld v. Commissioner, 165 Fed. (2d) 318, 319; Quock Ting v. United States, 140 U.S. 417, 420, 421. In the latter case the Court, in weighing the evidence of an interested witness, said, "There may be such an inherent*324 improbability in the statements of a witness as to induce the Court or jury to disregard his evidence, even in the absence of any direct conflicting testimony. He may be contradicted by the facts he states as completely as by direct adverse testimony, and there may be so many omissions in his account of particular transactions, or of his own conduct, as to discredit his whole story. His manner, too, of testifying may give rise to doubts of his sincerity, and create the impression that he is giving a wrong coloring to material facts. All these things may properly be considered in determining the weight which should be given to his statements, although there be no adverse verbal testimony adduced." But the mere fact of interest is not in itself sufficient reason to disregard the testimony of a witness, A & A Tool & Supply Co. v. Commissioner, 182 Fed. (2d) 300, 304; and, while self-serving declarations of interested witnesses are not necessarily determinative, "Yet such testimony cannot be waived aside merely because of its character. If it comes from witnesses who are impressive, if it is reasonable, if it is not inconsistent with other evidence in the case, and if it*325 is corroborated by other evidence, it is important." C. H. Spitzner & Son, Inc., 37 B.T.A. 511, 518; Cf. Blackmer v. Commissioner, 70 Fed. (2d) 255; Rand v. Helvering, supra; Foran v. Commissioner, 165 Fed. (2d) 705; Planters Operating Co. v. Commissioner, 55 Fed. (2d) 583. We recognize that the partnership, K.L. & M., can claim expense deduction from its gross income for 1943 for the alleged cash payments of $235,198.80, either as legitimate expense or as "black market" payments, Lela Sullenger, 11 T.C. 1076 (decided December 23, 1948), and that, therefore, King and his partners are "interested witnesses." Nevertheless we cannot disregard their testimony. In our opinion their testimony is impressive and it is corroborated. We recognize, also, that if, in 1943, the parties to the alleged agreement to pay "side-payments" above invoice prices believed such cash payments would be, at law, in violation of the Emergency Price Control Act, the payments would ordinarily be made in a secretive way, and the fact about the making of the alleged "side-payments" would be known only to the immediate parties to the*326 alleged transfers of cash. But under such circumstances, the law does not require "the impossible" in the matter of proof, and testimony is received and weighed with all the facts and inferences in the record in order to arrive at a proper inference - the ultimate fact upon which decision depends. Delone v. Commissioner, 100 Fed. (2d) 507; Greenfeld v. Commissioner, supra.The critical facts alleged by the respondent, about an understanding between petitioner and King involving cash "side-payments" must be inferred from the proven facts. In the face of the positive and corroborated testimony of respondent's witnesses that cash payments were made of $235,198.80 and $7,100 in 1943 and 1944 to Starr Pen Company through either Joseph or Samuel Starr, it has been found that the payments were made by King to petitioner and to Samuel Starr. The testimony of petitioner denying receipt of the several payments stands contradicted and discredited, and cannot be believed even though given under oath. Cf. Russel C. Mauch, 35 B.T.A. 617, 627. Petitioner has not rebutted the evidence of the respondent. He has not shown that the testimony of the respondent's*327 witnesses is improbable or unworthy of belief. We cannot arbitrarily discredit or disregard the competent and relevant testimony of respondent's witnesses. Petitioner has failed to contradict or discredit their testimony in its substance and on the whole. It is held that petitioner, under his burden of proof, has failed to overcome the prima facie correctness of the respondent's determinations. It is held, also, that the respondent, under his burden of proof, has established that Starr Pen Company sold the "Winchester" merchandise to K.L. & M., and that petitioner was paid, in cash, $7,100 therefor. It is held that the respondent has established by clear and convincing evidence that King made "side-payments" in cash to petitioner and Samuel Starr in the amounts of $223,198.80 and $12,000, respectively. The respondent's evidence is sufficient and adequate under his burden of proof. The additional amounts of accrued income of Starr Pen Company were not reported by it in its returns for the fiscal years involved, and it was not reflected in petitioner's returns for 1943 and 1944. Petitioner failed to report his distributive share of the additional income of the partnership in his*328 returns for 1943 and 1944. His understatement of his income is substantial in each year. The conclusion is inescapable that part of the deficiency for each year, 1943 and 1944, was due to fraud with intent to evade tax. It is so held. The respondent's determinations for 1943 and 1944 of deficiencies in tax and penalties are sustained. Decision will be entered under Rule 50. Footnotes1. Check No. 1522 dated 6- 1-43; cashed 5-28-43. ↩2. Check No. 1752 dated 7- 2-43; cashed 7- 1-43. ↩3. Check No. 1888 dated 7-16-43; cashed 7-17-43. ↩4. Check No. 2038 dated 7-30-43; cashed 7-31-43. ↩5. Check No. 2101 dated 8- 7-43; cashed 8-10-43. ↩6. Check No. 2347 dated 9- 3-43; cashed 9- 4-43. ↩7. Check No. 3314 dated 12-30-43; cashed 1- 3-44.↩*. This credit was entered in the journal as a credit to Starr Pen Company but was posted to the account of Conklin Pen Company in the accounts payable ledger of K. L. & M. because the charges for the checks cashed by King to make cash payments to petitioner were being entered in that account. ↩**. These credits were entered in the purchase journal as credits to Starr Pen Company, were posted to that account in the accounts payable ledger of K. L. & M. and were transferred to the account of Conklin Pen Company in that ledger without a journal entry. ↩***. The figure of $2,397.20 included the sum of $93.74, not involved in this proceeding, for merchandise purchased from Starr Pen Company not previously entered or posted on the books of K.L. & M.↩